[No. 6781-1-II.   Division Two.   June 10, 1985.]

DAVID SPURRELL, ET AL, *Appellants,* v. DELORES BLOCK, ET AL, *Respondents.*

Michael R. Noble, for appellants.

A. Clarke Johnson, Jr., Todd M. Worswick, Billett, Comfort & Rosenow, and Elvin J. Vandeberg, for respondents Block and Tacoma School District.

M. Lawrence Ross and David P. Hansen, for respondents Fredericks, Tacoma Police Department, and the City of Tacoma.

Kenneth O. Eikenberry, Attorney General, and W. Howard Fischer, Assistant, for respondents State, et al.

ALEXANDER, J.—David and Linda Spurrell individually and on behalf of their children appeal the trial court's grant of summary judgment in favor of all defendants on all of the Spurrells' claims for recovery. We affirm the trial court as to the claims against the defendants Bloch, Tacoma School District, Casey, Department of Social and Health Services, and the State of Washington. We affirm in part and reverse in part the ruling as to claims against the defendants Fredericks, Tacoma Police Department, and the City of Tacoma.

On the morning of June 20, 1979, Christine Spurrell, the 11–year–old daughter of David and Linda Spurrell, asked her mother if she could stay home from school with an earache. Mrs. Spurrell, a licensed practical nurse, consented, though she and Mr. Spurrell were employed outside the home during the day. It was agreed that while at home, Christine would provide care for her two younger sisters, ages 3 and 5, making it unnecessary for the two youngsters to go to their regular babysitter two blocks away. An older child, John, was also of school age and on this date he attended school, returning home at approximately 3:30 p.m.

Later that morning, after both parents had departed for

work, Christine received a telephone call from the defendant, Dolores Bloch, the school nurse on duty at Manitou Elementary School in the Tacoma School District. On learning that Christine was sick with an earache, Mrs. Bloch asked if her parents were home and if her mother had made a doctor's appointment for her. Christine said that her parents were not home and that she thought her parents had not made a doctor's appointment.

Nurse Bloch was aware that Christine experienced petit mal epileptic seizures from time to time and she believed the frequency of these seizures had been increasing. Mrs. Bloch had previously asked the Spurrells to have Christine's medication reevaluated. Mr. Spurrell had responded that he saw no reason to do so since his wife had not observed any particular problems. The Spurrells thought the frequency of the seizures was decreasing. Mrs. Bloch had told the Spurrells that her concern was based on the fact that the seizures were upsetting Christine's special education teacher.

Concerned for the girls, Mrs. Bloch discussed the situation with her school principal. She then made an oral report to a caseworker, Dianna Darland, of Children's Protective Services (CPS), a division of the defendant, Department of Social and Health Services of the State of Washington. This was followed by submission of a written abuse and neglect report to CPS signed by both Mrs. Bloch and the school principal.

Upon receipt of the nurse's oral report, a CPS caseworker called the Tacoma Police Department and asked that a "welfare check" be made at the Spurrell home. A police officer, the defendant Jense Fredericks, was dispatched to the Spurrell residence. The officer was informed by dispatch that Christine had epileptic seizures and "was without medication, or the medication was not working, . . ."

Upon arrival he spoke with Christine, ascertained her age, and observed the condition of the home, which he characterized as "extremely dirty." Officer Fredericks called nurse Bloch from the Spurrell home and she told him that

she could not say what should be done with the children. Fredericks decided to remove the children and called dispatch, which in turn called CPS for the address of a receiving home for the children. He did not make any attempt to contact the parents even though Christine offered him her father's telephone number. The officer indicated that he was motivated to remove the children from their home because he believed the condition of the house made future problems likely, and he did "not want to see them left in the condition for any length of time, . . ." He said the condition of the house was the primary reason for removal.[1] Lack of supervision was also an important factor in his decision. He conceded that he did not think the children were suffering physical abuse and probably would not be harmed in the time it would take to get a court order.[2] However, he believed it would be best and in line with department policy to "handle the situation right there." Further evidence of department policy was not submitted.

When Mr. and Mrs. Spurrell and their son John did not find the three girls at home later that afternoon, they were anxious and made inquiries in the neighborhood. They

---

[1]The alleged "dirty" condition of the Spurrell home is a fact in issue. Mr. and Mrs. Spurrell and Christine deny the condition of the home was as described by Officer Fredericks, admitting only that it was untidy. In her affidavit, Christine denied the officer's description of dirty clothes, moldy dishes, animal feces, and garbage lying around. She said that she had been told to "pick the place up and do the dishes . . .," but hadn't yet done so, that her bed was unmade, and clean clothes were piled in the living room that her brother John had been told to put away after school.

[2]From the deposition of Officer Fredericks:
"Q. Without belaboring the point, I want to ask you was there any evidence of abuse of the children?
"A. Physical abuse?
"Q. Physical abuse?
"A. Not that I could tell.
"Q. Mental abuse? Let's use that term also.
"A. I could not judge mental abuse.
"Q. Could you tell me did you have reason to believe that the children would be injured if you had left them there?
"A. Not physically injured, no."

subsequently called the Tacoma Police who told them the children had been picked up because they were left unattended. The police suggested they call CPS, which gave the same explanation and asked them to call back the next day. The next day the Spurrells spoke to another CPS caseworker, defendant James Casey. Casey was leaving the office on business and promised to call back. The Spurrells reached him later that afternoon. He said the children had been picked up because they were medically neglected and the younger children had been left with a child too young to babysit. The caseworker had the mistaken impression that children under 12 could not legally be left in charge of other children.

Later that day Casey asked the Spurrells to come down to the CPS office to complete some paperwork and said the children would be released then. In the meantime, Casey spoke with Dr. Gallucci, Christine's physician, who said that he had no reason for concern and did not feel there had been medical neglect. He was of the opinion that Christine needed to visit him once every 6 months, although he had a letter from Christine's former doctor recommending visits every 3 months. As Christine had not seen a doctor since March of 1978, Casey believed medical attention was necessary and was not likely to be provided. On meeting with the Spurrells, he asked them to agree to take Christine to the doctor. The parents signed forms described as a medical release and a "good faith nonbinding agreement," whereby they agreed to have Christine medically reevaluated. The children were released to them approximately 30 hours after their removal from the family home.

On July 10, 1979, Casey called to check whether Christine had seen a doctor. When told that she had not, he threatened to start dependency proceedings. The child's visit to a doctor on July 18 was reported to CPS. No proceedings were commenced.

The complaint in this action was filed on July 3, 1980, following the filing of formal claims against the City and

State of Washington as required by statute.[3] Summary judgment was granted in favor of all defendants on all claims lodged against them. Plaintiffs appeal all of the orders granting summary judgment except for their claims for invasion of privacy and violation of 42 U.S.C. § 1985, apparently abandoned.

We are asked to determine if summary judgment was properly granted. In reviewing summary judgment, the appellate court makes the same inquiry as the trial court. *Hartley v. State,* 103 Wn.2d 768, 698 P.2d 77 (1985). In a motion for summary judgment, the burden is on the moving party to demonstrate that there is no genuine dispute as to any material fact. CR 56. A "material fact" is a fact upon which the outcome of the litigation depends, in whole or in part. *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963). All reasonable inferences from the evidence must be resolved against the moving party. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982). The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach, supra.*

Plaintiffs seek relief against the defendants on numerous theories. In discussing the propriety of the court's order on summary judgment, we must discuss each claim separately with regard to the various defendants. As to all defendants, the trial court was correct in granting summary judgment on the claims of abuse of governmental position, outrage, wrongful infliction of emotional distress, custodial interference, and 42 U.S.C. § 1983.

### ABUSE OF GOVERNMENTAL POSITION

The Spurrells assert a cause of action for damages for abuse of governmental position, based on their allega-

---

[3]Apparently no claim was filed against the School District, as required by RCW 4.96. While the school defendants' answer asserts this issue, the trial judge apparently did not address it, and it has not been raised on appeal. Our disposition of the claims against the nurse and School District makes further consideration unnecessary.

tions that the defendants' statutory violations are evidence of acting in an illegal or manifestly arbitrary and capricious manner. They contend that this activity thus violated the plaintiffs' fundamental right to due process. No such cause of action is recognized in Washington. *Systems Amusement, Inc. v. State,* 7 Wn. App. 516, 500 P.2d 1253 (1972). In *Systems Amusement, Inc.,* a corporation sought money damages against the State, contending that by failing to grant the corporation a tavern license, the Washington State Liquor Control Board had arbitrarily deprived it of property without due process of law. In affirming the dismissal of that case on summary judgment, the court said:

> We are not aware of any statute or judicial determination, which establishes a "cause of action" for money damages in favor of a person or corporation and against the state for nontortious, discretionary acts of state agencies which are alleged to have been performed arbitrarily and capriciously. Indeed, plaintiff's counsel candidly invites us to create a "cause of action" based solely upon an alleged violation of a constitutionally guaranteed right: "No person shall be deprived of life, liberty, or property, without due process of law." Const. art. 1, § 3.
>
> Plaintiff misconstrues the basic nature of the due process clause. The clause is a protection against arbitrary action by the state; but if a person has his day in court, he has not been deprived of due process. *State v. Cater's Motor Freight Sys., Inc.,* 27 Wn.2d 661, 179 P.2d 496 (1947). Acts violative of the clause may be declared void by the courts, but the clause does not, of itself, provide the remedy of reparation.

*Systems Amusement, Inc.,* 7 Wn. App. at 518. Plaintiffs' rights are adequately protected by recognized causes of action; they have had their day in court.

Plaintiffs' reliance on *Butler v. Federal Way Sch. Dist. 210,* 17 Wn. App. 288, 562 P.2d 271 (1977), *review denied,* 89 Wn.2d 1022 (1978) is misplaced. In *Butler,* a dairy farmer sought damages from a school district, proceeding on a contract theory. Although the court discussed its jurisdiction to review arbitrary and capricious action of governmental officials, it would strain interpretation to find

that the case establishes a cause of action distinct from plaintiff's contract action. The better view, which we affirm, is the view expressed in *Systems Amusement, Inc., supra.* The constitutional guaranty of due process, Const. art. 1, § 3, does not of itself, without the aid of augmenting legislation, establish a cause of action for money damages against the State in favor of any person alleging deprivation of property without due process. This reasoning is equally applicable to both state and municipal entities. Summary judgment was properly granted.

### OUTRAGE

■ To be held liable for the tort of outrage, the defendants' conduct must have been *"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson,* 85 Wn.2d 52, 59, 530 P.2d 291, 77 A.L.R.3d 436 (1975), citing Restatement (Second) of Torts § 46, comment *d* (1965).

The question whether certain conduct is sufficiently outrageous is ordinarily a question for the trier of fact. *Jackson v. Peoples Fed. Credit Union,* 25 Wn. App. 81, 604 P.2d 1025 (1979). The court, however, must determine in the first instance that reasonable minds could differ on whether the conduct has been sufficiently extreme and outrageous to result in liability. *Jackson v. Peoples Fed. Credit Union, supra.* In making this determination, the court must consider: (1) the position occupied by the defendants; (2) whether plaintiffs were particularly susceptible to emotional distress, and if defendant knew this fact; (3) whether defendants' conduct may have been privileged under the circumstances; (4) whether the degree of emotional distress caused by a party was severe as opposed to mere annoyance, inconvenience, or normal embarrassment; and (5) whether the actor was aware that there was a high probability that his or her conduct would cause severe emotional distress and proceeded in a conscious disregard

of it. *Jackson v. Peoples Fed. Credit Union, supra; Phillips v. Hardwick,* 29 Wn. App. 382, 628 P.2d 506 (1981); Restatement (Second) of Torts § 46 and comments (1965).

In the instant case, the plaintiffs' affidavits simply do not put in issue material facts as to the elements of outrage. We believe, as did the court in *Guffey v. State,* 103 Wn.2d 144, 146, 690 P.2d 1163 (1984), that "these facts do not 'come anywhere near' the elements [of outrage] . . . ." At most, the plaintiffs' allegations raise an issue of negligence. Nor do the affidavits establish "severe emotional distress." Reasonable minds could only conclude that the conduct of all the defendants was not outrageous. The trial court correctly dismissed this cause of action.

### WRONGFUL INFLICTION OF EMOTIONAL DISTRESS

██ To recover on a theory of wrongful infliction of emotional distress, plaintiffs must first demonstrate mental or emotional distress. They have failed to do so. Nor have they surpassed a further restriction on liability, which is proof of objective symptomatology. *Hunsley v. Giard,* 87 Wn.2d 424, 553 P.2d 1096 (1976). Plaintiffs have claimed one sleepless night, tears, loss of appetite, and anxiety. While in some cases such transitory signs could be "symptoms," we do not see signs of distress above that level which is a fact of life. *See Hunsley v. Giard, supra.* The claim was properly denied.

### 42 U.S.C. § 1983

The plaintiffs claim civil rights violations, alleging deprivation of their constitutional liberty interest in noninterference with the family, and seeking to recover from the individual defendants as well as their employers. We discuss the positions of the various defendants separately.

A. Department of Social and Health Services and State of Washington

42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . .,

subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, . . .

■ A state is not a "person" within the meaning of the civil rights statutes. *Quern v. Jordan,* 440 U.S. 332, 59 L. Ed. 2d 358, 99 S. Ct. 1139 (1979); *Edgar v. State,* 92 Wn.2d 217, 595 P.2d 534 (1979), *cert. denied,* 444 U.S. 1077 (1980).

While a state may waive its sovereign immunity and consent to suit under § 1983 in a state court, our State has not done so. In *Rains v. State,* 100 Wn.2d 660, 674 P.2d 165 (1983), our Supreme Court held that the State did not waive its immunity by adopting RCW 4.92, which provides that the State is liable for its tortious conduct as if it were a private person. State agencies, such as the Department of Social and Health Services, are likewise not considered "persons" within the meaning of the act, being in legal effect the same as the State. *Rains v. State, supra.* The dismissal was proper.

B. City of Tacoma and Tacoma School District

■ The Spurrells seek to establish liability against two municipal entities, the City of Tacoma and the Tacoma School District, on a theory of respondeat superior. They allege no independent basis for liability, but seek to hold the City and School District liable as employers. While the United States Supreme Court has held that local governments are "persons" under § 1983, they cannot be held liable solely on a theory of respondeat superior. *Monell v. Department of Social Servs.,* 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); *Spencer v. King Cy.,* 39 Wn. App. 201, 692 P.2d 874 (1984). Local governing bodies can be sued directly under § 1983 where

the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Monell,* 436 U.S. at 690. There are no allegations or sug-

gestions here that these local governments officially adopted any policies, ordinances, or customs which resulted in the alleged constitutional violations. As the plaintiffs' action against these entities was based on respondeat superior, it was properly dismissed.

C. Bloch, Fredericks, and Casey

█ The Spurrells allege § 1983 violations by the individual defendants and seek to impose liability against them. Under *Wood v. Strickland*, 420 U.S. 308, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975), an individual public official is immune from liability if the official acted under a good faith reasonable belief that his or her conduct was constitutional. *See Hocker v. Woody*, 95 Wn.2d 822, 631 P.2d 372 (1981).

The Spurrells have not challenged the constitutionality of RCW 26.44.010 *et seq.*, the statute under which these defendants proceeded. Therefore, to recover, they would have to show a "violation of a constitutional right and the absence of any reasonable, subjective good faith intent." *Hocker v. Woody*, 95 Wn.2d at 825. The affidavits presented to the trial judge show no evidence of malicious intent on the part of any of these defendants which would bring their actions within the purview of § 1983. The § 1983 claims against these defendants were properly dismissed.

The three remaining theories by which plaintiffs seek recovery are defamation, custodial interference, and false imprisonment. The defamation cause of action is directed only against the defendants Bloch and Fredericks and their respective employers, the Tacoma School District, Tacoma Police Department, and City of Tacoma. The other two causes of action are maintained against all defendants except defendants Bloch and the Tacoma School District.

### DEFAMATION

The allegedly defamatory communications are the written reports the individual defendants each made regarding

the Spurrell children and the condition of their home.[4] The defendants had a statutory duty or right to make these reports pursuant to former RCW 26.44.030.[5] The persons rendering such reports are protected by RCW 26.44.060 which provides:

> (1) Any person participating in *good faith* in the making of a report pursuant to this chapter . . . shall in so doing be immune from any liability arising out of such reporting . . .

(Italics ours.) If Nurse Bloch had "reasonable cause" to believe that a child had suffered abuse or neglect, she was obliged to make a report. RCW 26.44.030(1). Officer Fredericks was permitted to make such a report to DSHS pursuant to RCW 26.44.030(2) and to his superiors under police department procedures. The affidavits presented to the trial court do not suggest a lack of "good faith" in making the reports. Nor do these affidavits refute Bloch's and Fredericks' affidavits asserting that they acted in "good faith." Plaintiffs' brief suggests that the defendants were "negligent" in making these statements in reports. In view of the defendants' immunity from liability for reports made

---

[4]Nurse Bloch made her report in writing to Children's Protective Services. Officer Fredericks apparently rendered a written report to his superiors although a copy of that report was not given to the trial court. Plaintiffs allege defamation in Bloch's statement that "Christine's parents were neglecting the child's medical treatment." They allege defamation by Officer Fredericks in his description of the Spurrell home.

[5]RCW 26.44.030 provided:

"Reports—Duty and authority to make—Duty of receiving agency. (1) When any practitioner, *professional school personnel, registered or licensed nurse,* social worker, psychologist, pharmacist, or employee of the department has reasonable cause to believe that a child or adult developmentally disabled person has suffered abuse or neglect, he shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department as provided in RCW 26.44.040. . . .

"(2) *Any other person* who has reasonable cause to believe that a child or adult developmentally disabled person has suffered abuse or neglect *may* report such incident to the proper law enforcement agency or to the department of social and health services as provided in RCW 26.44.040 as now or hereafter amended." (Italics ours.)

in "good faith," a showing of mere negligence is not enough. While we would not suggest that such reports could be freely distributed without regard for individual privacy, in light of the statutory requirements and protections, we must conclude the elements of the cause were not made out in this case, and dismissal was proper.

CUSTODIAL INTERFERENCE

Mr. and Mrs. Spurrell assert unlawful interference with their right of custody, through the removal and retention of the children. Few Washington cases discuss this cause of action. In *Magnuson v. O'Dea,* 75 Wash. 574, 135 P. 640 (1913), the court held that one who intentionally and against the parents' wishes interferes with the custody of children, whether by abduction or enticement, stands liable to the parents. The plaintiff in *Magnuson* alleged conceal- ment of a minor child from the parent for 7 months. The court noted that a right of action in such cases was based upon loss of services and that, under such circumstances, parents could then recover compensatory damages for men- tal distress and loss of the child's companionship.

More recently this cause of action was analyzed extensively in *Strode v. Gleason,* 9 Wn. App. 13, 510 P.2d 250, 60 A.L.R.3d 924 (1973). The court reviewed trends in the law and held that the cause of action, which it termed "malicious alienation of the affections of a minor child", *Strode* at 13, headnote 2, was a valid extension of the com- mon law. It acknowledged that loss of custody or services would be an element of damages rather than an element of the claim itself. Central to *Strode* is the holding that alien- ation of affections of a family member takes place gradually and "cannot be said to have occurred until some overt act takes place which shows a want of affection." *Strode,* at 20. In other words, the action accrues only when the loss of affection is sustained.

We think that the court's reasoning in *Strode* is persua- sive and relevant to contemporary conditions and relation- ships. As there has been no allegation of malice, alienation,

or lost affection, there can be no recovery. The trial court properly dismissed the claim.

## FALSE IMPRISONMENT

Finally, we address the Spurrells' claim of false imprisonment, raised on behalf of their three daughters. We affirm the grant of summary judgment dismissing the claim against defendants Casey, DSHS, and the State of Washington. We reverse as to defendants Fredericks, Tacoma Police Department, and City of Tacoma.

### A. Defendants Casey, DSHS, and State

The affidavits presented to the trial court reciting portions of deposition testimony make clear that these defendants were not involved in the decision to remove the girls from the home. Officer Fredericks stated that he had already made the decision to remove the girls before calling for the address of a receiving home. The caseworkers who contacted the police after Nurse Bloch's report and later gave the receiving home address did not urge that the children be taken into custody. Viewing the testimony and records presented to the trial court in the light most favorable to the plaintiffs and granting them any reasonable inferences that may be drawn therefrom, we see no factual dispute involving these defendants in the removal decision. The officer further stated:

Q. Under Department policy are you accorded discretion in the manner in which you handle welfare calls?
A. Yes.
Q. Would it be fair to say it is a matter of judgment on your part in each particular case?
A. Yes.
Q. And I take it that judgment is exercised in light of the circumstances as you find them as you enter the house?
A. Yes.
Q. And that discretion and judgment was exercised from the moment you walked in the house and made your initial observation?
A. Yes.

Plaintiffs argue, however, that the State of Washington and DSHS, acting through Mr. Casey, falsely imprisoned the children because they were not promptly released to their parents. This argument fails because DSHS was presented with a "fait accompli"; once the children were placed in their custody, they had a duty to investigate, RCW 26.44.050, and to place the children in shelter care during investigation. RCW 13.34.060. Children thus taken into custody may be held for up to 72 hours without a court order. RCW 26.44.056(1). The Spurrell children were released some 30 hours after their removal from their family home. In light of the situation facing the Department and the statutory duty to investigate while protecting the children, we believe that the trial court's dismissal of these defendants was correct.

B. Officer Fredericks, Tacoma Police Department and the City of Tacoma

Our Supreme Court has stated that "[t]he gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority: . . ." *Bender v. Seattle*, 99 Wn.2d 582, 591, 664 P.2d 492 (1983). In *Guffey v. State*, 103 Wn.2d 144, 690 P.2d 1163 (1984), the Supreme Court recognized that police officers have a qualified immunity from false imprisonment claims arising out of everyday operational acts. The officer must have been: (1) carrying out a statutory duty; (2) acting according to procedures set by statute or supervisors; and (3) acting reasonably. *Guffey*, 103 Wn.2d at 152. Furthermore, a finding of employee nonliability precludes any finding that the employer is liable, when liability is based solely on the doctrine of respondeat superior. *Guffey v. State*, 103 Wn.2d at 153; *Nyman v. MacRae Bros. Constr. Co.*, 69 Wn.2d 285, 418 P.2d 253 (1966).

The real issue, then, is the immunity of Officer Fredericks from suit for false imprisonment. If there is no immunity, there is a fact question concerning the officer's

justification for the confinement of the Spurrell children, which can only be resolved by the trier of fact. For immunity to arise, an officer must act "reasonably" in carrying out a statutory duty according to procedures dictated by statute and superiors. In the instant case, we do not believe the trial court was justified in finding as a matter of law that the cloak of immunity applies and, thus, it incorrectly dismissed the claim on summary judgment. We so conclude because the officer, by his own admission, was not carrying out his duty according to procedures dictated by statute, the second requirement of *Guffey*. RCW 26.44.050 provides, in part, as follows:

> A law enforcement officer may take, or cause to be taken, a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050.

While nothing in the record refutes the officer's assertion that he believed the children were abused, he has not established a reasonable belief that the children would be harmed if he took the time to obtain a court order. In fact, his deposition testimony was that he could have secured an order without harm befalling them. He testified:

> A. I probably could have taken the time to get a court order without any harm coming to the children then. However, it is our policy to handle the situation at that time. That is my primary job, deal with it when the situation arises.

While Officer Fredericks has said he observed departmental procedures, it is clear from his testimony that statutory dictates were not followed. Departmental procedures, which are not in evidence, may not be more restrictive of liberty than the statute. Immunity from suit for false imprisonment, therefore, cannot exist. We do not suggest, however, that the failure to observe the statute in this case automatically establishes liability; failure to establish immunity does not prove the elements of a claim. The offi-

cer may still establish a defense to such an action by proving to the satisfaction of the trier of fact the existence of reasonable grounds to believe the children's health, safety, and welfare would have been seriously endangered if they had not been taken into custody immediately. RCW 13.34-.050; RCW 26.44.050. *See Bender v. Seattle,* 99 Wn.2d at 592.

## TAXATION OF COSTS

Plaintiffs also assign error to the trial court's order granting costs of depositions to Casey, DSHS, and the State. While the costs associated with discovery depositions are not ordinarily a taxable cost, *Gabel v. Koba,* 1 Wn. App. 684, 463 P.2d 237 (1969), there are exceptions to that rule. When defendants prevail, the costs incurred in taking depositions in support of their motions for summary judgment which were specifically considered by the trial court are taxable. *Gearheart v. Shelton,* 23 Wn. App. 292, 595 P.2d 67 (1979). We concur with that reasoning. The Superior Court stated that its decision was based in part on the materials submitted by these respondents, and on examination of the record, we believe the court must have done so. The costs were, thus, properly taxed.

In sum, we affirm the ruling of the trial court in granting summary judgment dismissing all claims against all respondents except Officer Fredericks, Tacoma Police Department, and City of Tacoma. We affirm the granting of summary judgment in favor of those respondents on all claims against them except the claim for false imprisonment. We reverse the summary judgment insofar as it dismissed the latter claim against those respondents and remand the matter for trial on that claim.

REED, A.C.J., and PETRICH, J., concur.

Review denied by Supreme Court September 20, 1985.