[No. 22760-2-I. Division One. February 18, 1992.]

RICHARD M. WALLER, ET AL, *Appellants*, v. THE STATE
OF WASHINGTON, ET AL, *Respondents*.

*Phillip C. Raymond, Cameron G. Comfort,* and *Ogden Murphy Wallace,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Todd Gay, Assistant,* for respondents.

SCHOLFIELD, J. — In July 1986, Richard and Robin Waller individually and as guardians ad litem for S.W. and R.W., minors, filed a complaint seeking recovery of damages, and now appeal the trial court's order granting a motion for summary judgment made on behalf of the State of Washington and three Department of Social and Health Services (DSHS) caseworkers. We reverse.

## FACTS

Richard Waller and Frances Moore, a.k.a. Frances Lanham, a.k.a. Frances Waller, were married on July 13, 1975. Two children, a girl, S.W., b.d. January 9, 1977, and a boy, R.W., b.d. September 19, 1979, were born of the marriage. A decree of divorce was entered on March 31, 1982. Frances was awarded custody of the children, and Richard was granted liberal visitation.

In May of 1982, Frances filed a motion to modify the divorce decree to allow her to move to Seattle, to increase the child support obligation, and to reduce visitation. Richard resisted the motion and requested that Frances be held in contempt for repeatedly obstructing his midweek visitations. The trial court granted Frances' request to move to Seattle, but sentenced her to 60 days in jail (with all but 3 suspended) for contempt for refusing Richard his visitation.

In December 1982, Frances filed a citizen's criminal complaint, charging Richard with unlawfully recording a conversation between them. Richard had tape-recorded one of his attempts to exercise his visitation rights, and the tape had been admitted into evidence at Frances' contempt hearing. Richard was acquitted after a jury trial in June 1983.

In August 1983, Frances filed a complaint with Child Protective Services (CPS), alleging that Richard had sexually abused both children. CPS caseworker Margaret Coan was assigned to investigate the allegations. According to Coan's case notes, Frances told her R.W. had reported that on a recent visitation, Richard had deliberately cut R.W.'s knee, had threatened to cut off R.W.'s penis, and had put three marbles up R.W.'s anus. The next day, Frances telephoned again and told Coan that S.W. reported that Richard put his hand in her vagina when he slept with her.

In late September 1983, Frances filed a petition for modification of visitation rights, alleging that Richard had sexually abused both S.W. and R.W. At a show cause hearing on October 3, 1983, the court commissioner eliminated Richard's visitation rights until further order of the court. The Wallers' brief indicates that Coan "supported" Frances' filing of the petition to modify visitation. However, the State's brief denies that assertion, and states in its brief that there is no evidence that Coan supported the filing of the petition.

The record before this court indicates that the evidence before the commissioner in the October 3, 1983, hearing consisted of several documents. Frances' affidavit stated that both children told her that their father had performed various acts of sexual abuse on them during their recent summer visitation. The affidavit also indicated that there was an ongoing investigation concerning these matters by the Snohomish County Sheriff's Office and CPS. The affidavit requested that the court curtail all visitation rights until the matter was fully resolved.

A second affidavit from Frances stated that Katherine Runyon, M.D., had examined the children and that her office notes were incorporated by reference into the affidavit. Frances also indicated that the children were seen by Katherine Day, Ph.D., a clinical psychologist, and that her report was also incorporated by reference.

Runyon's notes indicated that both children reported a number of incidents of sexual abuse by their father.[1] R.W.'s genital exam revealed a red rash, while S.W.'s exam showed some reddening around the vaginal orifice. Day's report stated that testing of the children was inconclusive, but that both children showed a serious disturbance in their relationship with their father. However, Day's report states that sexual abuse was hard to either substantiate or rule out. She recommended that a full investigation be made by CPS, including an evaluation of Richard by someone trained to evaluate sexual offenders.

The record before the commissioner also contained the declaration of Catherine Broom, a therapist at Luther Child Center. The declaration stated that Broom had interviewed R.W. and S.W. on two occasions, and that it was her evaluation that the children had been physically and sexually abused by their father. Broom's declaration strongly recommended that the court eliminate any contact between the children and their father, either supervised or unsupervised, until a full investigation could be completed.

Richard's response indicated that during 1983, Frances denied his visitation rights over 50 percent of the time. Furthermore, Richard's response denied the allegations of sexual abuse, and stated that he believed Frances had influenced the children to make the allegations in order to deny him his visitation rights.

In the course of the CPS investigation, the children were seen by a number of individuals, including a police detective, several therapists, and at least one pediatrician. The reports back to Coan by the professionals all indicated that the children reported being abused by their father. Additional allegations were raised during the CPS investigations. These were that Richard had engaged in vaginal intercourse and committed indecent liberties upon S.W. and had committed numerous bizarre sexual acts with the children, including acts with multiple partners.

---

[1]The notes specifically detail the sexual abuse described.

Coan suggested that Richard be evaluated by Northwest Treatment Associates. According to the affidavit of Steven Wolf, the codirector of the agency, the agency was provided with the reports of the two therapists the children had seen, and Wolf spoke with Coan and with Richard's parents, in addition to evaluating Richard. Wolf stated in his affidavit that Richard did not fit the personality profile and testing performance typical for adult male sex offenders. Wolf's affidavit also indicated that the evaluation suggested that if the children were sexually abused, it was by someone other than Richard.

On October 18, 1983, Richard's parents met with two DSHS caseworkers, Margaret Coan and Dorothy Guthrie. The senior Wallers told the caseworkers about their observations of Frances' psychological abuse of the children and provided them with a written complaint. They provided the caseworkers with names of individuals who would corroborate their contentions that Frances' allegations about Richard were fabricated to show that the children were being coached. The senior Wallers also told the caseworkers about the previous court battles over visitation.

On December 21, 1983, the senior Wallers were sent a letter from a CPS supervisor, Carol Landaas, indicating that a thorough investigation had been made of their complaint. However, the letter indicated that Coan was unable to substantiate any child abuse by Frances of either S.W. or R.W.

Coan's deposition indicated that as a result of the senior Wallers' complaint she did a home visit with Frances, but had no other discussions, and did not treat the complaint as a "formal complaint". Coan was questioned regarding a series of letters she received from various persons regarding Frances' abuse of her children. Coan indicated that although she read the letters, she took no steps to investigate the complaints alleged in them concerning Frances.

The record contains the affidavit of Jane Ramon, a former caseworker supervisor for DSHS' Child Sexual Abuse Unit. Ramon's affidavit indicated that, in her opinion, the work of

Coan and the other two caseworkers involved, Guthrie and Oellien, fell substantially below the standard of care for CPS caseworkers. The affidavit contained a long list of items that Coan failed to do. These items can be summarized as Coan's failure to fully investigate the possibility that the sexual abuse allegations were untrue and motivated by Frances' desire to harm Richard, and Coan's failure to do any meaningful investigation of the complaints lodged against Frances.

On April 25, 1984, Richard filed a motion and affidavit to reinstate his visitation rights. According to the affidavit of George Bowden, the attorney who represented Richard in that hearing, Frances and her attorney argued to the commissioner that Coan had determined that the allegations against Richard had been substantiated and that Coan had sent Richard's name into the central registry of known sexual abusers.

In addition, Frances submitted Coan's deposition, taken on May 3, 1984. In that deposition, Coan indicated that both of the children told her and the detective that their father had committed acts of sexual abuse upon them. When asked to give her opinion, based on her knowledge of the situation and her experience in dealing with similar situations, Coan stated that she believed that the children were telling the truth in their interview with the detective. On May 14, 1984, the commissioner denied a motion by Richard to reinstate his visitation rights.

Trial commenced on the petition to modify visitation in Snohomish County on October 24, 1984. At that time, Judge Kershner stayed the proceedings and ordered that the parents and the children undergo an independent professional psychological evaluation. Dr. Julie Moore was appointed. Dr. Moore designed a program of supervised visitation for the children and Richard.

The first supervised visit took place on March 9, 1985, with a second supervised visit occurring later in the month. On March 27, 1985, Frances filed a burglary report alleging

that Richard had entered her home and threatened S.W. and Frances' stepdaughter with a pistol and a knife. Richard was able to prove that he was in Wenatchee at the time of the alleged burglary, and no complaint was filed.

On June 17, 1985, Frances filed another CPS complaint, alleging that during the supervised visit at McDonald's on March 9, 1985, Richard had pulled down R.W.'s pants and struck the child's penis. The CPS worker did not contact the visit supervisor. Instead, according to the Wallers' complaint (filed July 1986), she told Frances to lodge a new complaint against Richard.

In late June 1985, Dr. Moore requested that custody be changed, on the basis that Frances was emotionally and psychologically abusing the children. Frances responded by removing the children to Wyoming. On July 8, 1985, the Snohomish County Superior Court issued a temporary order changing custody to Richard's parents. Richard was successful in enforcing the order in Wyoming, and the children were returned to Washington.

Trial actually took place on the custody matter in February 1986. The court entered findings of fact consistent with its position that the allegations of sexual abuse against Richard were without foundation, and that the children had been coached and intimidated by Frances into making false accusations against their father. The trial court granted Richard permanent custody of S.W. and R.W., and gave Frances 2 hours per month of supervised visitation.

In July 1986, the Wallers filed their complaint in the instant action against numerous parties, including the State of Washington and the DSHS caseworkers involved. Their brief set forth 13 causes of action: defamation, invasion of privacy, negligence and malpractice, tortious interference with parental rights, outrage, alienation of affections, malicious prosecution, federal civil rights violations, state civil rights violations, federal constitutional violations, state constitutional violations, and unfair trade practices.

The trial court granted the defendants' motion for summary judgment on all claims, except for the claim of inter-

ference with the parent-child relationship. The portions of the order pertinent to this appeal were set forth as follows:

1. All claims based in negligence, to include but not limited to, the manner in which accusations against either parent were investigated, the failure to remove the children from the custody of the mother, alleged violation of regulations, statutes and constitutional provisions, and negligent infliction of emotional distress are dismissed, the court having concluded there is no authority in Washington recognizing a cause of action in negligence on behalf of the children or the affected parent against the State under the factual circumstances presented in this case; and a claim for negligent infliction of emotional distress was not plead[ed].

2. Claims under 42 USC §1983 are dismissed, the court having concluded that defendant state employees are absolutely immune from suit under §1983 for alleged conduct in carrying out their statutory duties which are quasi-prosecutorial in nature;

. . . .

4. The claim of outrage is dismissed, the court having concluded that the facts presented failed to approach the legal threshold for establishing a prima facie case of outrage;

. . . .

8. Federal constitutional claims are dismissed subject to §1983 immunity;

9. Claims under the state constitution are dismissed, plaintiffs having conceded no independent tort cause of action for violation of due process is allowed in Washington.

The claim of interference with parent-child relations is not dismissed, the court having concluded the allegations of malicious interference raises a question for the jury and the court being without sufficient facts to decide whether court-ordered modifications broke the causal connection between the alleged conduct of defendant caseworkers and the alleged injuries.

This appeal timely followed.

STANDARD OF REVIEW

 A summary judgment motion may be granted under CR 56(c):

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See also Herskovits v. Group Health Coop.*, 99 Wn.2d 609, 664 P.2d 474 (1983). The court must consider the evidence

in the light most favorable to the nonmoving party. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*, 81 Wn.2d 528, 503 P.2d 108 (1972).

To rebut a properly supported summary judgment motion, the adverse party may not rest on allegations, but must set forth specific facts showing there is a genuine issue for trial or have the summary judgment, if appropriate, entered against him. CR 56(e); *see also LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975). On review of an order granting summary judgment, the appellate court must "engage in the same inquiry as the trial court." *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

### IMMUNITY FROM SUIT

RCW 26.44.050 sets forth the duty of DSHS with respect to abuse and neglect:

> Upon the receipt of a report concerning the possible occurrence of abuse or neglect, it shall be the duty of the law enforcement agency or the department of social and health services to investigate and provide the protective services section with a report in accordance with the provision of chapter 74.13 RCW, and where necessary to refer such report to the court.

With respect to civil liability in cases of child abuse or neglect, RCW 26.44.060 reads in pertinent part:

> (1) (a) . . . [A]ny person participating in good faith in the making of a report pursuant to this chapter or testifying as to alleged child abuse or neglect in a judicial proceeding shall in so doing be immune from any liability arising out of such reporting or testifying under any law of this state or its political subdivisions.
>
> . . . .
> (3) . . . Nothing in this chapter shall be construed as to supersede or abridge remedies provided in chapter 4.92 RCW.[2]

The trial court determined that there was no Washington authority to allow the Wallers to pursue a claim for negli-

---

[2]RCW 4.92 is entitled "Actions and Claims Against the State", and RCW 4.92.090 provides that the State of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising'out of its tortious conduct to the same extent as if it were a private person or corporation.

gent investigation. Subsequent to the trial court's order, the Washington State Supreme Court decided *Babcock v. State*, 112 Wn.2d 83, 768 P.2d 481 (1989) (*Babcock* I). In that case, the natural father and his dependent children sued the State and individual caseworkers for negligence, alienation of affections, and outrageous conduct, when the girls were placed by DSHS in a foster home where they were sexually molested. The dependency action had been initiated in Louisiana. Once the case was transferred to Washington, only dependency review hearings were conducted. No dispositional hearing was held.

The *Babcock* I court affirmed the summary judgment of dismissal, holding that the State and the individual caseworkers were immune from suit for negligent foster care investigation and placement, based on the notion of quasi-prosecutorial immunity and witness immunity. The *Babcock* I opinion went on to note that the adversarial nature of dependency proceedings makes it unnecessary to have subsequent civil liability proceedings as a check on the fairness or thoroughness of the dependency process or of DSHS. *Babcock* I, at 101-02.

However, the Supreme Court granted a motion for reconsideration in the case and subsequently filed a second opinion, *Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991) (*Babcock* II). In its analysis, the *Babcock* II court first considered whether the caseworkers were entitled to quasi-judicial absolute immunity. The *Babcock* II court rejected such a notion, recognizing that under absolute immunity, a caseworker could deliberately put a child in a foster placement with a known rapist and escape tort liability. *Babcock* II, at 606.

Noting that the Legislature has extended only a qualified immunity under RCW 26.44.056 to caseworkers who must remove children from their homes in emergency situations,[3]

---

[3]RCW 26.44.056(3) states:

"A child protective services employee, an administrator, doctor, or law enforcement officer shall not be held liable in any civil action for the decision for taking the child into custody, if done in good faith under this section."

the *Babcock* II court stated that where the Legislature has not seen fit to grant absolute immunity, it would be inappropriate for the courts to do so for politically unaccountable caseworkers. *Babcock* II, at 607.

The *Babcock* II court went on to state that binding state precedent in *Bender v. Seattle*, 99 Wn.2d 582, 664 P.2d 492 (1983) precluded the extension of absolute immunity. According to the *Babcock* II court, the *Bender* court held that a police officer who obtained an arrest warrant from a magistrate could still be liable for false arrest. This was because the police officer was not just carrying out a court order. Rather, the officer was "in a position to control the flow of information to the magistrate upon which probable cause determinations are made.' " *Babcock* II, at 607-08 (quoting *Bender*, at 592).

The *Babcock* II court noted that the Ninth Circuit extended quasi-judicial immunity to a caseworker who removed a newborn pursuant to a court order in *Coverdell v. Department of Social & Health Servs.*, 834 F.2d 758 (9th Cir. 1987). The court noted, however, that in the case before it, the placement was made prior to a court order, and thus the conduct was outside the judicial process, unlike the circumstances in *Coverdell*. *Babcock* II, at 609-10.

Similarly, the *Babcock* II court rejected the application of quasi-prosecutorial immunity to caseworkers. According to the *Babcock* II opinion, the caseworkers were performing investigative, not quasi-prosecutorial functions. In its analysis, the *Babcock* II court noted that the United States Supreme Court has provided for immunity for prosecutors for " 'initiating a prosecution and in presenting the State's case' " (*Babcock* II, at 610 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976))), but that absolute immunity did not apply to a prosecutor's investigative functions. *Babcock* II, at 610.

According to *Babcock* II, the federal courts have denied immunity to prosecutors and caseworkers investigating child abuse allegations, except for the extension of quasi-prosecutorial immunity for the actual initiating of proceed-

ings to deprive parents of custody of their children. *Babcock II*, at 613. The *Babcock II* opinion specially noted the decision in *Meyers v. Contra Costa Cy. Dep't of Social Servs.*, 812 F.2d 1154 (9th Cir. 1987).

In *Meyers*, a civil rights action under 42 U.S.C. § 1983, Meyers' wife complained to the Contra Costa County Department of Social Services (DSS) that Meyers had sexually molested their son. Haaland, a DSS social worker, investigated the sexual abuse complaint.

It was alleged that on October 23, 1981, Haaland ordered Meyers to stay away from his home until a judicial hearing took place on October 26. At the October 26 hearing, Haaland indicated he would arrange for supervised visitation between Meyers and his children, but only two visits took place between October 26, the date the petition was filed, and November 17, the date the petition was dismissed pursuant to Haaland's recommendation. Further, it was alleged that Haaland testified at a January 19, 1982, custody hearing that it was his conclusion that Meyers had molested his son. *Meyers*, at 1156.

The *Meyers* court held that Haaland, as a witness, was entitled to absolute immunity for his testimony during the dependency proceedings and the custody hearing. *Meyers*, at 1156 (citing *Briscoe v. LaHue*, 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983)). In addition, the *Meyers* court held that Haaland was entitled to prosecutorial immunity for the initiation and pursuit of the dependency proceedings against Meyers, stating:

> The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of the prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

*Meyers*, at 1157.

Nevertheless, the *Meyers* court held that Haaland was entitled only to a qualified immunity for his action in order-

ing Meyers to leave his home pending a judicial hearing. According to the *Meyers* court, Haaland's conduct was neither advocatory nor quasi judicial. Haaland was not "contributing to an informed judgment by an impartial decisionmaker as an advocate". *Meyers*, at 1157. In addition, the *Meyers* court indicated that policy considerations did not support the application of absolute immunity to Haaland's action.

The *Meyers* court stated that in *Sellars v. Procunier*, 641 F.2d 1295 (9th Cir.), *cert. denied*, 454 U.S. 1102, 70 L. Ed. 2d 644, 102 S. Ct. 678 (1981), it had examined the benefits of absolute immunity for particular decisionmakers, and then had gone on to note:

> Nevertheless, the balance might not be struck in favor of absolute immunity were it not for the presence of safeguards built into the judicial process that tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct.

*Meyers*, at 1158 (quoting *Sellars*, at 1300).

The *Meyers* court determined that the proper qualified immunity test was whether the conduct complained of "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Meyers*, at 1158 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)). The *Meyers* court determined that Haaland's order to Meyers to stay away from the home for 3 days pending the hearing did not involve physical interference with custody, and could not have been said to have violated a clearly established statutory or constitutional right. *Meyers*, at 1158.

Having analyzed the *Meyers* opinion, the *Babcock* II court noted that the caseworkers and DSHS had not used the statutory disposition process in determining the placement of the girls in the abusive foster home environment. The court stated that if they had done so, the judicial process would have provided the necessary safeguards discussed in *Meyers*. *Babcock* II, at 615.

The *Babcock* II (116 Wn.2d 596, 809 P.2d 143 (1991)) court rejected the reasoning contained in *Babcock v. Tyler*, 884 F.2d 497 (9th Cir. 1989), *cert. denied*, 493 U.S. 1072, 107 L. Ed. 2d 1025, 110 S. Ct. 1118 (1990). That decision granted the *Babcock* caseworkers absolute immunity from suit for the Babcocks' § 1983 claims. According to the *Babcock* II court, that decision was not determinative because it was based on some incorrect factual statements contained in *Babcock* I (112 Wn.2d 83, 768 P.2d 481 (1989)). *Babcock* II, at 616.

In *Babcock v. Tyler, supra,* the Ninth Circuit apparently utilized the erroneous factual statement contained in *Babcock* I, which indicated that a dispositional hearing was held in Washington. As noted above, only dependency review hearings were held. Placement decisions, by statute, are accomplished in dispositional hearings. *See* RCW 13.34.110, .120. In addition, the *Babcock v. Tyler, supra,* opinion erroneously indicated that all of the sexual molestation took place after a court order confirmed the DSHS foster placement. *Babcock* II, at 606 n.8.

■ Having distinguished the opinion in *Babcock v. Tyler, supra,* the *Babcock* II court held that the caseworkers were entitled to a qualified immunity for following statutory procedures, citing the Washington Supreme Court opinion in *Guffey v. State*, 103 Wn.2d 144, 690 P.2d 1163 (1984). To qualify for immunity, the caseworker must:

> (1) carry out a statutory duty, (2) according to procedures dictated by statute and superiors, and (3) act reasonably.

*Babcock* II, at 618.

In addition, the *Babcock* II court noted that caseworkers cannot claim qualified immunity if they cannot show they followed appropriate statutory and regulatory procedures in every respect, that their actions were reasonable, and that their statutory duties required their actions. According to the *Babcock* II court, obtaining the approval of their legal counsel is insufficient. *Babcock* II, at 618.

■ Moreover, the *Babcock* II court held that legislative policy requires that the qualified immunity applied to the caseworkers not be applied to the State. According to the *Babcock* II court, an agent's immunity from civil liability does not shield the principal. *Babcock* II, at 619-20 (citing Restatement (Second) of Agency § 217 (1958)).

The *Babcock* II court acknowledged that it had extended the personal immunities of certain officials to the government. However, that was only where the government entities themselves had committed no acts of their own. In *Babcock* II, the plaintiffs alleged negligent supervision. *Babcock* II, at 621.

Thus, the *Babcock* II court reversed the summary judgment for the negligence claims, and remanded the case for further proceedings.

Richard asserts the liability of the caseworker and DSHS arises from the two broad categories of acts. The first category concerns the caseworkers' determination that Richard sexually abused the children. The second category concerns the caseworkers' failure to investigate the complaint against Frances and to file a dependency petition once that investigation was completed.

With respect to the first category, the caseworkers' determination that Richard sexually abused the children could make them liable only if that determination was a proximate cause of Richard's being deprived of his right to see the children. The relevant hearings are the ones that took place on October 3, 1983, and May 14, 1984. The record does not show that Coan or any other caseworker participated in the October 3, 1983, hearing.

■ However, portions of Coan's deposition were introduced as evidence in the May 14, 1984, hearing. The admission of her deposition is sufficient to raise an issue of fact as to whether Coan's allegedly negligent investigation was a proximate cause of Richard being deprived of visitation. Quasi-prosecutorial immunity does not apply because the

caseworkers were not in the process of initiating dependency proceedings. Pursuant to RCW 26.44.060, Coan may be entitled to qualified witness immunity for any liability arising out of the use of portions of her deposition in the May 14, 1984, hearing. The record before us is not sufficient for us to consider further the possible conflict between liability for negligent investigation and possible witness immunity under RCW 26.44.060.

The caseworkers may be entitled to qualified immunity. However, that decision turns on the factual question of whether the caseworkers' determination that Richard sexually abused the children was reasonable, pursuant to the test set forth in *Babcock* II. Thus, summary judgment would not be appropriate as to the caseworkers' actions in deciding that Richard had molested the children.

The second broad category of misconduct alleged by the Wallers concerns the caseworkers' failure to adequately investigate those claims. Applying the *Babcock* II analysis, we hold that quasi-prosecutorial immunity does not apply because the caseworkers were performing investigative functions only, and therefore, summary judgment was inappropriate as to this claim. As the *Babcock* II court stated, investigation of child abuse allegations is not immune, with the exception of immunity for actual initiation of dependency proceedings. *See Babcock* II, at 613.

In addition, any qualified immunity applicable to the caseworkers cannot be extended to the State of Washington as a defense to the Wallers' claim of negligent supervision. The *Babcock* II opinion clearly states that such an extension of immunity would be inappropriate. Summary judgment on this issue is reversed.

## 42 U.S.C. § 1983 CLAIMS

The State contends that absolute quasi-prosecutorial immunity applies to bar the Wallers' § 1983 claims. 42 U.S.C. § 1983 states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the juris-

diction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

As noted above, the Washington State Supreme Court in *Babcock* II has determined that only caseworkers can claim a qualified immunity for their actions. Although the issue of § 1983 claims was not before it, the *Babcock* II court took notice of the Ninth Circuit's resolution of those claims, and stated that the holding in *Babcock v. Tyler, supra*, granting absolute immunity was based on some erroneous facts.

The *Babcock v. Tyler, supra*, court indicated that the caseworkers were entitled to absolute immunity because their actions took place as part of an ongoing dependency proceeding. The case before us is distinguishable because no dependency action was ever initiated. Therefore, only a qualified immunity would apply. However, as set forth above, the *Babcock* II court appears to have adopted a different qualified immunity test from that set forth by the Ninth Circuit in *Meyers v. Contra Costa Cy. Dep't of Social Servs.*, 812 F.2d 1154 (9th Cir. 1987).

In *Landrum v. Moats*, 576 F.2d 1320 (8th Cir.), *cert. denied*, 439 U.S. 912, 58 L. Ed. 2d 258, 99 S. Ct. 282 (1978), the Court of Appeals stated that § 1983 provides federal redress for wrongs done under color of state law, and that state law or common law defenses cannot be used without considering the policies and purposes of § 1983. *Landrum*, at 1328 n.15.

Similarly, in *Hampton v. Chicago*, 484 F.2d 602 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 39 L. Ed. 2d 471, 94 S. Ct. 1413 (1974), the Court of Appeals held that a claim that the State's attorney and his assistant were immune from a federal Civil Rights Act suit filed in connection with a police raid on an apartment was a question of federal law. The State Tort Immunity Act was not controlling as to a § 1983 suit. *Hampton*, at 607.

■ Therefore, the appropriate test for caseworker immunity as applied to the Wallers' § 1983 claims would appear to be the test set forth in *Meyers v. Contra Costa Cy. Dep't of*

*Social Servs., supra.* The qualified immunity question is whether the caseworkers' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Meyers,* at 1158. The summary judgment on this issue must be reversed to enable the trial court to apply this test. It follows that dismissal of the Wallers' due process claims should also be reversed and remanded for further proceedings.

With respect to state constitutional claims, the trial court's order indicated that the Wallers conceded that no independent tort cause of action for violation of due process existed in Washington, and this portion of the order is not challenged on appeal. *See also Spurrell v. Block,* 40 Wn. App. 854, 701 P.2d 529, *review denied,* 104 Wn.2d 1014 (1985).

## OUTRAGE AND NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS

■ The Wallers contend that there existed a genuine issue of material fact regarding their claim of outrage, and that although their claim for negligent infliction of emotional distress was not specifically pleaded, under a system of notice pleading the issue was raised. In *Grimsby v. Samson,* 85 Wn.2d 52, 530 P.2d 291, 77 A.L.R.3d 436 (1975), the Washington State Supreme Court discussed the elements of the tort of outrage. First, the emotional distress must be inflicted intentionally or recklessly; mere negligence is insufficient. Second, the defendant's conduct must be "outrageous and extreme". Tortious or criminal intent, or malice will not suffice. Liability arises only when the conduct is:

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Grimsby,* at 59 (quoting Restatement (Second) of Torts § 46, comment *d* (1965)).

We hold that the trial court properly dismissed the claim of outrage. Even accepting the Wallers' factual allegations

as true, there is no conduct complained of that contains the elements set forth in *Grimsby*. Even if it is shown that the caseworkers may have been grossly negligent in choosing to believe Frances' allegations and in choosing not to thoroughly investigate Richard's claims, their conduct cannot be characterized as going "beyond all possible bounds of decency". While it is true that substantial evidence has shown that the caseworkers were in error when they believed Frances' allegations, the caseworkers were supported in part by the expert opinions of therapists. Thus, their conduct cannot be said to have been outrageous.

■ The claim of negligent infliction of emotional distress was not set forth in the complaint. Nonetheless, under notice pleading, the Wallers need not have specifically listed this cause of action to obtain recovery, if the facts supporting the claim were properly pleaded. *See Sherwood v. Moxee Sch. Dist. 90*, 58 Wn.2d 351, 363 P.2d 138 (1961).

■ However, as the State argues, the facts alleged do not support such a claim. In *Cunningham v. Lockard*, 48 Wn. App. 38, 736 P.2d 305 (1987), the Court of Appeals stated that the tort of negligent infliction of emotional distress was recognized in Washington in *Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976). The *Cunningham* court delineated certain limitations to be placed on the class of persons who may recover for negligent infliction of emotional distress. The pertinent limitation here was stated as follows:

> [W]e conclude that policy considerations dictate that the legal liability of defendants who negligently inflict emotional distress must be limited to plaintiffs who are actually placed in peril by the defendant's negligent conduct and to family members present at the time who fear for the one imperiled.

*Cunningham*, at 44-45.

The caseworkers' negligent conduct did not involve actual peril (physical harm) as that term is commonly understood. Thus, the Wallers did not set forth facts sufficient to preclude summary judgment. The trial court is affirmed on this issue.

## MALICIOUS INTERFERENCE WITH THE
## PARENT-CHILD RELATIONSHIP

The State argues that the Wallers failed to allege facts sufficient to sustain an allegation of this tort. Ordinarily, the denial of a summary judgment motion is not an appealable order. *Sea-Pac Co. v. United Food & Comm'l Workers Local 44*, 103 Wn.2d 800, 699 P.2d 217 (1985). It does not appear from the record here that the question of whether the State should have been granted discretionary review of the partial denial of its summary judgment motion was ever raised. However, the cross-appeal issue has been raised and briefed, and in the interests of judicial economy, we consider it. This court may waive or alter the Rules of Appellate Procedure in a particular case "in order to serve the ends of justice . . .". RAP 18.8(a).

The State contends that the Wallers alleged no evidence that the State or its caseworkers engaged in conduct amounting to alienation of affection. In *Strode v. Gleason*, 9 Wn. App. 13, 510 P.2d 250, 60 A.L.R.3d 924 (1973), the Court of Appeals first acknowledged that no Washington cases had recognized the tort of alienation of affections of a minor child.

Nonetheless, the *Strode* court determined that the "trend of the law" would recognize such a cause of action. *Strode*, at 17. The *Strode* court approved the trial court's delineation of the elements of the tort:

1. An existing family relationship[;]
2. A wrongful interference with the relationship by a third person[;]
3. An intention on the part of the third person that such wrongful interference results in a loss of affection or family association[;]
4. A causal connection between the third [party's] conduct and the loss of affection[;]
5. That such conduct resulted in damages.

*Strode*, at 14-15.

In *Spurrell v. Block, supra*, three of the Spurrells' minor children were removed from their home based on a CPS

complaint made by one of the children's school nurse. A police officer sent to the home to check on the children found that the parents were not at home and removed the children. The children were released to the parents approximately 30 hours after they were removed. The *Spurrell* court denied recovery for the tort of custodial interference, which the court likened to alienation of affections, citing *Strode*. According to the court, there were no allegations of malice, alienation, or lost affection. *Spurrell*, at 867-68.

However, here the Wallers certainly have alleged all the elements of the cause of action for alienation of affections of the children. They must still overcome the hurdle of proving malice — that is, an intent that Richard lose the affection of his children — on the part of the caseworkers. Nonetheless, that is a factual issue, not resolvable on summary judgment. We hold that the summary judgment was properly denied.

The summary judgment of the trial court is reversed with respect to negligent investigation of the sexual abuse allegations against Richard and the 42 U.S.C. § 1983 claims. All other aspects of the judgment are affirmed.

GROSSE, C.J., and AGID, J., concur.

Reconsideration denied March 17, 1992.

Review denied at 119 Wn.2d 1014 (1992).