[No. 35689-5-I.   Division One.   January 26, 1998.]

RICHARD L. GILLIAM, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL., *Respondents*.

*James L. White* and *Jay DeMers*; and *William M. Weir*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Gregory F. Brunson* and *Michael E. Tardif, Assistants*, for respondents.

BECKER, J. — Richard Gilliam's ex-wife initiated a Child Protective Services (CPS) investigation against him in May, 1985, alleging that their two children reported being sexually molested by Gilliam. Gilliam initially stipulated to an order of dependency barring him from any visitation with the children. Eventually, however, the dependency was dismissed, and Gilliam received custody of the children.

Gilliam sued the State and the CPS caseworker, claiming the caseworker's inadequate investigation of the allegations inordinately prolonged the dependency proceedings

and his separation from his children, resulting in mental anguish and expenses.[1] After Gilliam rested his case, the State moved for a directed verdict on the basis that the State and the caseworker were entitled to absolute immunity. The trial court granted the motion,[2] and dismissed the suit. Gilliam appeals from that ruling.

We are asked to decide whether an absolute immunity shields the State from a suit for damages caused by a caseworker's negligent investigation conducted after the filing of a dependency action. The State claims the caseworker's actions were entitled to absolute immunity because they were functionally like a prosecutor's, and because the adversarial nature of the judicial process provided Gilliam with opportunity to challenge any of the caseworker's representations or recommendations. We conclude the conduct complained of was investigative in nature, and insufficiently tied to the judicial process to warrant a grant of absolute immunity. Accordingly, we reverse the order directing a verdict for the State.

## FACTS

Richard Gilliam and his wife, Ruby, divorced in 1982. The decree provided that their son and daughter would live with Ruby, and Richard would have visitation rights. Ruby then married Yvain Stansberry.

On May 17, 1985, Ruby Stansberry reported to Child Protective Services that the children, four and five years of age, said Gilliam had sexually abused them. CPS case-

---

[1] *See* CP 318-20 (Plaintiff's Resp. to Def's Mot. for Summ. J.).

[2] Although the trial court's oral decision referred to "qualified immunity" as the basis for directing the verdict, it is obvious the trial court meant to say "absolute immunity" because the ruling adopted the rationale presented by the State. At oral argument in this court, both sides agreed it is preferable to consider the ruling as based on absolute immunity. Accordingly, we do not address Gilliam's argument that qualified immunity is not available to the State, even though that is the argument on which he concentrated his appellate briefing. The issue of absolute immunity was considered by the trial court and is sufficiently briefed to permit review. RAP 12.1(a); *Ackerman v. Sudden Valley Community Assoc.*, 89 Wn. App. 156, 944 P.2d 1045 (1997).

worker Ann Morrow received the assignment. On May 21, Morrow contacted Gilliam by telephone. Gilliam denied abusing his children, but he agreed not to visit them during the investigation. Morrow immediately filed dependency petitions for both children against Gilliam. The parties entered an agreed shelter care order placing the children with the mother, and prohibiting Gilliam from visiting them. Gilliam agreed to submit to a sexual deviancy evaluation, and arranged an appointment with Dr. Allen Traywick, an evaluator approved by CPS.

Gilliam also retained an attorney, Jay DeMers. DeMers and Gilliam's sisters, who also met with Morrow, testified that Morrow insisted from the outset that Gilliam was guilty of the abuse, and said she did not want to listen to "dirt" about Ruby Stansberry. DeMers began his own investigation. From hospital personnel who had tended to Ruby Stansberry's pregnancy in October, 1984, DeMers learned that her new husband had been seen hitting one of the Gilliam children. The hospital social worker, who had a confrontation with Yvain Stansberry about the incident, described his reaction as violent and abusive. DeMers reported this information to caseworker Morrow, who called the social worker to verify it.

Dr. Traywick, upon beginning his evaluation of Gilliam, had asked DeMers for more information regarding the CPS allegations. At DeMers' request, Morrow on July 10 provided a typed copy of the Service Episode Record (SER) with entries through June 28. On September 18, DeMers happened to see the State's copy of the SER. He learned that the copy supplied to him by Morrow omitted certain entries recording information about Yvain Stansberry's mental instability. Morrow was aware that Stansberry was currently involved with psychiatric hospital treatment, but did not provide this information to Gilliam, to Dr. Traywick, or to the children's therapists.

In early June, DeMers suggested that Morrow should look into the possibility that Yvain Stansberry was responsible for the alleged abuse. In August, Dr. Traywick

suggested that Ruby and Yvain Stansberry be evaluated for psychological disturbance. On September 10 Dr. Traywick filed a report summarizing his evaluation of Gilliam up to that point. He noted results favorable to Gilliam from polygraph and plethysmograph testing, but declined to make a formal recommendation until the Stansberrys could be similarly evaluated: "While these results in and of themselves are not necessarily iron clad proof of innocence they certainly raise questions regarding existing allegations and there is, in my view, reason to psychologically assess all parties that have had parental responsibility for care of the Gilliam children." Morrow did not, however, seek such an evaluation. The Gilliam children, by now in therapy, repeated their descriptions of acts of sexual molestation they said Gilliam had done.

On November 15, 1985, Gilliam agreed to a negotiated order of dependency. Gilliam claims he agreed to the order because it was the only way he could get the State to investigate the Stansberrys. The order declared the children dependent as to Gilliam and stated the children would continue to reside with the mother. There was to be no contact between Gilliam and the children except as recommended and conditioned by the children's therapist. But the order also required both Stansberrys to submit to polygraph testing, required Yvain Stansberry to authorize a release of his hospital records pertaining to mental health diagnoses and treatment to the State, and required the State to share such records with Gilliam. Under the order, Yvain Stansberry was to participate in an anger management program, and Gilliam was to participate in individual counseling and authorize a release of his records so his therapist could supply information to the court and to the children's therapist.

Nine months later, in July 1986, Gilliam filed this tort suit and left for an extended job assignment in Saudi Arabia. He returned home once a year and saw his children on those visits. In his absence from Washington the tort suit was stayed, but dependency review hearings continued. By

this time other caseworkers were involved, and their view of the case began to shift when the result of Yvain Stansberry's polygraph examination indicated deception on issues of sexual abuse. Though a later polygraph test showed a different result, Mr. Stansberry was temporarily required to move out of his home where the Gilliam children were residing. Eventually, the court ordered Yvain Stansberry to submit to a sexual deviancy evaluation by Dr. Traywick.

Dr. Traywick submitted a report of his evaluation of Yvain Stansberry in September 1987. He could not conclude that Stansberry molested the children, but he did conclude that Stansberry presented a "malignant clinical picture and I believe there has been a concerted effort on behalf of both the client and his wife to shield themselves from investigation." Dr. Traywick also concluded Yvain Stansberry presented a

> more pathological clinical picture than the children's father, Mr. Gilliam, and it is my impression that the original allegations can be seriously challenged. Moreover, this writer is at a loss to understand why Mr. Stansberry and his wife were not evaluated at the time this case was being investigated as there was information that Mr. Stansberry had a history of psychiatric problems.

Dr. Traywick also evaluated Ruby Stansberry and interviewed the children. He concluded that both Stansberrys had "actively colluded to improperly influence the Gilliam children in making allegations against their father."

DeMers filed a motion to remove the children from the Stansberry household. By this time, Gilliam had the cooperation of the State, through a different caseworker. The court agreed and in an order dated August 13, 1988, approved placement of the children with Gilliam's parents.

Gilliam returned to Washington from Saudi Arabia in 1989. Upon further review of the dependency, the court allowed the children to be placed with Gilliam. After monitoring the placement for a time and finding it satisfactory, the caseworkers recommended that Gilliam be formally

recognized as the custodial parent. On February 2, 1990, the superior court entered an order modifying the decree of dissolution between Richard Gilliam and his former wife. The modification awarded joint custody of the children to Ruby Stansberry and Richard Gilliam, awarded Gilliam physical custody, and granted Yvain and Ruby Stansberry liberal visitation rights. On December 14, 1990, the juvenile department dismissed the dependency of the Gilliam children, finding further monitoring unnecessary. Whether there had been sexual abuse of the children and if so, who perpetrated it, were issues never conclusively resolved in a judicial forum.

In 1994 trial began on the tort complaint that Gilliam filed in 1986. By this time, caseworker Ann Morrow had died. Expert witnesses testified that Morrow closed her mind too early to the possibility that Gilliam had not sexually abused his children; that she should have voluntarily shared the information about Yvain Stansberry's psychiatric problems with Dr. Traywick and the therapists who were treating the children; and that she should have earlier sought evaluation of the Stansberrys. A former CPS supervisor testified that Morrow breached the standard of care, based on CPS policies, regulations and state statutes, by making an incomplete disclosure of the SER under the circumstances. She also testified the SER in Gilliam's case reflected a lack of supervisory review of Morrow's handling of the case.

The State contested the negligence claim, but did not get to the point of presenting its defense case. At the close of the plaintiff's case, the trial court found the State was protected by absolute immunity from Gilliam's claim for negligent investigation.

## ABSOLUTE IMMUNITY

An immunity "frees one who enjoys it from a

lawsuit whether or not he acted wrongly."[3] Absolute immunity protects the State as well as its agents, in contrast to the qualified personal immunity of a State employee, which does not extend to the State.[4] "Absolute immunity necessarily leaves wronged claimants without a remedy. This runs contrary to the most fundamental precepts of our legal system. Therefore, in determining whether a particular act entitles the actor to absolute immunity, we must start from the proposition that there is no such immunity."[5]

■■ The State's essential position is that the State and its caseworkers are not subject to suit for any actions related to a dependency once they formally initiate a dependency proceeding. In the trial court, the State also questioned the existence of a duty giving rise to a cause of action in negligence.[6] Though the issues have a tendency to become confused with each other, the issue whether a duty exists does not bear on the availability of absolute immunity.[7] The focus of an inquiry into a proposal for absolute immunity is the degree to which the function performed by

[3]*Richardson v. McKnight*, 521 U.S. 399, 117 S. Ct. 2100, 2103, 138 L. Ed. 2d. 540 (1997).

[4]*Savage v. State*, 127 Wn.2d 434, 441, 445, 899 P.2d 1270 (1995).

[5]*Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 105, 829 P.2d 746 (1992) (holding under RCW 64.40.020, which grants a cause of action for arbitrary land use decisions, that a county and county council are not immune from suit brought against a hearing examiner in his official capacity).

[6]In *Lesley v. Department of Soc. & Health Servs. (DSHS)*, 83 Wn. App. 263, 921 P.2d 1066 (1996), *review denied*, 131 Wn.2d 1026 (1997), this court recognized a cause of action for negligent investigation of a child abuse allegation, as distinct from negligent placement, based on RCW 26.44.050 (which provides that DSHS caseworkers have a duty to investigate). Whether that same duty arose in the circumstances of this case is not an issue raised on appeal.

[7]The State has numerous defenses that do not bear on the issue of immunity. At various points in this action, the State has not only questioned whether a duty exists but, if so, whether the duty is owed to Gilliam, or only to his children; whether Morrow breached the duty; if so, whether her breach proximately caused Gilliam's damages; whether Gilliam contributed to his own damage or failed to mitigate it when, after stipulating to the order of dependency, he left the country for three years; whether the doctrine of collateral estoppel applies to bar Gilliam from relitigating issues resolved when he stipulated to the order of dependency; and whether it is unfair to make the State defend the conduct of a caseworker who is no longer alive at the time of trial, nine years after the events in dispute. To determine whether the State enjoys immunity from Gilliam's suit, it is not

the conduct at issue is "intimately associated" with the judicial phase of a proceeding.[8] Gilliam seeks to attach liability to the caseworker's function of investigating allegations of child abuse. We review the issue de novo because characterization of the functions of a caseworker is a question of law.

In granting the motion for a directed verdict, the trial court relied on our Supreme Court's decision in *Babcock v. State*.[9] On appeal, both parties claim *Babcock* supports their respective positions.

In *Babcock*, plaintiffs alleged that caseworkers negligently placed several foster children with a relative who then raped them. The question presented was "whether the absolute immunity granted judges under state common law should extend to caseworkers."[10] The court held the caseworkers were entitled to a qualified personal immunity if they could show they carried out a statutory duty reasonably and in accordance with procedures.[11] But the caseworkers were not entitled to an absolute immunity:

> Absolute immunity shields the recipient from liability for willful misconduct as well as negligence. A caseworker cloaked in absolute immunity could deliberately arrange a foster care placement with a known rapist in order to facilitate the sexual

necessary to resolve any of these questions, and they are beyond the scope of this opinion.

[8]*See Buckley v. Fitzsimmons*, 509 U.S. 259, 270, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)); *Taggart v. State*, 118 Wn.2d 195, 211, 822 P.2d 243 (1992) (focus of inquiry is on "the function performed and not the person who performs it"; holding parole board is entitled to absolute quasi-judicial immunity for decisions to deny, grant, or revoke parole, because such decisions are essentially judicial in nature; also holding parole officers are not entitled to absolute quasi-judicial or discretionary immunity for supervising parolees, but are entitled to qualified immunity for doing so).

[9]*Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991).

[10]*Babcock v. State*, 116 Wn.2d at 606.

[11]*Babcock v. State*, 116 Wn.2d at 618 (citing *Guffey v. State*, 103 Wn.2d 144, 690 P.2d 1163 (1984)).

abuse of a child and escape tort liability. This should not be the law.[12]

The children involved in the *Babcock* case were initially found dependent in Louisiana. After a four-day hearing a Louisiana court ordered that the children be placed with their grandparents in Richland, Washington.[13] Washington's caseworkers agreed to supervise the placement pursuant to an interstate compact. Without seeking a court order, the caseworkers then unilaterally changed the placement to the home of an uncle who molested them. The court stated the caseworkers "would have a stronger case for absolute immunity"[14] if they had "initiated a petition to establish a Washington dependency and then had the results of the investigation entered into evidence and made a part of an adversary process focusing on disposition."[15] The *Babcock* court emphasized that the caseworkers operated "almost entirely outside of the judicial process."[16]

Relying on these statements in *Babcock*, the State contends it should enjoy absolute immunity because Morrow did initiate a dependency proceeding and did have the results of her investigation entered into evidence. This court rejected the same argument in *State v. Lesley*,[17] a case involving a similar claim of negligent investigation, noting that "*Babcock* is ambiguous, and the language favoring absolute immunity is dicta."[18]

The State contends *Lesley* is distinguishable because

---

[12]*Babcock v. State*, 116 Wn.2d at 606.

[13]*Babcock v. State*, 116 Wn.2d at 599.

[14]*Babcock v. State*, 116 Wn.2d at 612.

[15]*Babcock v. State*, 116 Wn.2d at 612.

[16]*Babcock v. State*, 116 Wn.2d at 617. *See also Meyers v. Contra Costa County*, 812 F.2d 1154, 1157 (9th Cir. 1987) (immunity did not bar a suit arising out of a caseworker's order that the allegedly abusive parent stay away from his home because the caseworker "acted unilaterally prior to the operation of the judicial process") *cited in Babcock*, 116 Wn.2d at 614.

[17]*Lesley v. DSHS*, 83 Wn. App. 263, 921 P.2d 1066 (1996).

[18]*Lesley v. DSHS*, 83 Wn. App. at 277.

there the investigations occurred before the filing of the dependency action. The State continues to maintain that *Babcock* created, albeit in dicta, a set of circumstances in which a caseworker will enjoy absolute immunity even for investigative functions so long as the conduct complained of occurs after an adversarial process has begun. Here, all interested parties, including both parents, were before the court; and Gilliam, who was represented by counsel from the beginning, had the opportunity to contest the dependency, oppose any recommendation made by the caseworker, and persuade the court to adopt his position instead of the State's. The State argues that under these circumstances the caseworker's investigation is protected by judicial process immunity.

■ ■ The rationale for absolute judicial process immunity is set forth in *Butz v. Economou*.[19] The United States Supreme Court acknowledged in *Butz* that private damages actions are an important means of preventing tortious conduct by officials carrying out governmental functions.[20] Nevertheless, the common law provides absolute immunity to participants in judge-supervised trials to ensure they can carry out their special responsibilities without harassment or intimidation.[21] When extended to judges, prosecutors, grand jurors, witnesses, and others who perform official functions in the judicial phase of a proceeding, absolute immunity protects the "nature of the judicial proceeding itself"[22]:

> The reasons for this rule are also substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings

---

[19]*Butz v. Economou*, 438 U.S. 478, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978).

[20]*See Butz v. Economou*, 438 U.S. at 512.

[21]*See Butz v. Economou*, 438 U.S. at 512.

[22]*Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).

should be "given every encouragement to make a full disclosure of all pertinent information within their knowledge."[23]

Absolute immunity creates a risk that citizens will suffer irremediable wrong at the hands of those actors whom absolute immunity protects, but certain "safeguards built into the judicial process"[24] tend to reduce the risk:

> The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.[25]

According to the State, the risk that anyone will suffer harm from a caseworker's investigation of child abuse allegations is sufficiently reduced when it takes place within the framework of the adversarial process. Like the *Lesley* court, however, we do not read *Babcock*'s rejection of immunity for acts outside the judicial process as necessarily extending immunity to every act within the judicial process. *Babcock* itself defies such an interpretation: "It is good policy to grant caseworkers a qualified immunity for initiation of dependency proceedings without granting absolute immunity for everything they do while a depen-

---

[23]*Briscoe v. LaHue*, 460 U.S. at 335 (quoting *Imbler v Pachtman*, 424 U.S. 409, 439, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)).

[24]*Butz v. Economou*, 438 U.S. at 512.

[25]*Butz v. Economou*, 438 U.S. at 512 (footnote omitted).

dency review process continues."[26] To hold that the initiation of a dependency proceeding is by itself sufficient to confer immunity for all management of the case occurring thereafter would create an undesirable incentive for caseworkers to file allegations immediately, with little or no investigation, simply to gain the shelter of immunity.

Public prosecutors enjoy absolute judicial process immunity for their advocacy functions and for their decisions to initiate and move forward with judicial proceedings.[27] Some courts hold caseworkers have the immunity of a public prosecutor in their function of initiating and presenting dependency allegations in court.[28] But Gilliam is not alleging negligence in the initiation or advocacy of the allegations of abuse; rather, his claim is for negligent investiga-

---

[26]*Babcock v. State*, 116 Wn.2d at 616 (cited in *Lesley v. DSHS*, 83 Wn. App. at 277).

[27]*See Butz v. Economou*, 438 U.S. 478; *Creelman v. Svenning*, 67 Wn.2d 882, 410 P.2d 606 (1966); *Kalina v. Fletcher*, 522 U.S. 118, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997).

[28]*See, e.g., Meyers v. Contra Costa County*, 812 F.2d 1154, 1157 (9th Cir. 1987) ("The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit. We therefore hold that social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings."); *Ernst v. Child & Youth Servs.*, 108 F.3d 486, 495 (3d Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 139 (1997) ("[W]e hold that the CYS defendants are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings. . . . because (1) the functions performed by the CYS defendants in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.").

*But see Babcock v. State*, 116 Wn.2d at 608 ("[b]ecause of the extraordinary sweep of absolute immunity," our Supreme Court has not extended prosecutorial or judicial immunity to anyone but prosecutors and judges); *Waller v. State*, 64 Wn. App. 318, 334, 824 P.2d 1225 (1992) (reversing summary judgment in favor of CPS caseworker and State on claim of negligent investigation brought by father and his children; holding "investigation of child abuse allegations is not [absolutely] immune, with the exception of immunity for actual initiation of dependency proceedings.").

tion. In *Buckley v. Fitzsimmons*,[29] the United States Supreme Court drew a line between advocacy and investigation:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."[30]

A child abuse investigation is more akin to police work than prosecutorial advocacy.[31] As exemplified by Morrow's actions, it is an ongoing case management process that includes identifying wrongdoers and gathering evidence of allegations. Neither police nor prosecutors enjoy immunity for investigative work merely because the conduct complained of occurs after charges are filed;[32] we see no reason why a different rule should apply to caseworkers.

Only those functions which are subjected to the "crucible of the judicial process"[33] have sufficient checks against misconduct to warrant immunity. While the work of caseworkers has a degree of association with the judicial phase of a dependency, it is more peripheral than the core functions of judging, advocating, prosecuting, fact-finding,

---

[29]*Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993).

[30]*Buckley v. Fitzsimmons*, 509 U.S. at 273 (quoting *Hampton v. City of Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)).

[31]*See* RCW 26.44.050 (duty to investigate belongs to "the law enforcement agency or the department of social and health services").

[32]*See Buckley*, 509 U.S. at 273, n.5. ("Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity.").

[33]*Imbler v. Pachtman*, 424 U.S. 409, 440, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (White, J., concurring).

and testifying.[34] The mechanisms of the adversarial process do not directly promote proper investigative practices, nor do they supply sufficient assurance that carelessness or deliberate misconduct will come to light before irreparable harm occurs. In accord with *Lesley*, we hold absolute immunity is not available for investigations conducted by caseworkers into allegations of child abuse.[35] Our holding essentially represents a judgment that the court's truth-finding function in dependency and related matters will survive, and the integrity and independence of the judicial process remain intact, notwithstanding the exposure of the State and its caseworkers to liability for negligent investigation.

## NEGLIGENT SUPERVISION

Gilliam sought to make the State liable not only for the allegedly negligent investigation conducted by Morrow, but also on a theory that the State negligently supervised Morrow. The trial court dismissed the claim of negligent supervision at the close of Gilliam's case, and he appeals.

An employer is generally vicariously liable for negligent acts of an employee conducted within the scope of employment. When an employee causes injury by acts beyond the scope of employment, an employer may be li-

---

[34] *Cf. Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 108-109, 829 P.2d 746 (1992) (immunity not available for county quasi-judicial decision-making in land use matters because the procedural safeguards of the purely judicial process do not apply "with the same force in the quasi-judicial land use setting as they do in the purely judicial setting.").

[35] At issue here is the trial court's decision to direct a verdict for the State on Gilliam's claim for negligent *investigation*. Whether the State is absolutely immune from a damage claim based upon a caseworker's *filing* of a dependency action is therefore not at issue, and we do not so hold, even implicitly as suggested by the concurring opinion. *See supra*, note 28 and associated text. We hold only that the State is not immune to a claim alleging negligence in investigation. *See supra*, note 7. Accordingly, we do not specify the proof required in such a claim, as such questions should first be argued to and decided by the trial court.

able for negligently supervising the employee.[36] Whether conduct is inside or outside the scope of employment is ordinarily a question for the jury.[37] Here, the State acknowledged Morrow was acting within the scope of her employment, and that the State would be vicariously liable for her conduct. Under these circumstances a cause of action for negligent supervision is redundant. If Gilliam proves Morrow's liability, the State will also be liable. If Gilliam fails to prove Morrow's liability, the State cannot be liable even if its supervision was negligent. We find no error in the trial court's dismissing the cause of action given the record before it.

## NEGLIGENCE PER SE

At the close of his case, Gilliam also moved under CR 15(b) for permission to amend his pleadings to include a claim for statutory violations by the State's workers. He referred to this cause of action as negligence per se. The court denied the motion on the basis that the State was prejudiced by the late addition of a new theory. Gilliam assigns error to this ruling.

Negligence per se is not a separate cause of action.[38] Rather, it is a method of proving negligence through evidence of statutory violations. Gilliam filed his case prior to August 1, 1986. Prior to this date, violation of a statute, ordinance, or administrative rule was negligence as a matter of law.[39] Showing that Morrow violated pertinent statutes is one way Gilliam can prove she was negligent. To obtain instructions on the statutes he claimed she violated,

---

[36]*See, e.g., Niece v. Elmview Group Home*, 131 Wn.2d 39, 51, 929 P.2d 420 (1997); *Thompson v. Everett Clinic*, 71 Wn. App. 548, 555, 860 P.2d 1054, *review denied*, 123 Wn.2d 1027, 877 P.2d 694 (1993); *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 747 P.2d 1124 (1987).

[37]*See* WPI 50.02, .03.

[38]16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE, TORT LAW AND PRACTICE § 1.52 (1993).

[39]RCW 5.40.050. *See* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE, TORT LAW AND PRACTICE § 1.52 (1993).

it was not necessary to amend the complaint. We therefore treat this assignment of error as moot.

The dismissal of plaintiff's claim for negligent supervision is affirmed. The dismissal of plaintiff's claim of negligent investigation on the basis of absolute immunity is reversed. The case is remanded for proceedings consistent with this opinion.

Cox, J., concurs.

Baker, C.J. (concurring) — As I read the majority opinion, it implicitly recognizes that the State is absolutely immune from a damage claim based upon the caseworker's decision to file a dependency petition, the filing thereof, and vigorous prosecution of the allegations therein. We hold, however, that absolute immunity does not extend to a claim based upon a theory of negligent investigation.

I agree, but I write separately to express caution concerning the scope of allowable elements of damage if this claim proceeds on remand. This case did not begin as a claim for negligent investigation, resulting in increased mental anguish by reason of prolonged separation from appellant's children. Rather, the case was pleaded and tried on a variety of theories, almost all of which are directly based upon the conduct of the State in deciding to file, then filing and prosecuting a dependency proceeding. Indeed, nowhere in this record does the appellant clearly state a claim for damages by reason of prolonged separation resulting from negligent investigation, as that claim is characterized in the majority opinion.

This case does not involve a claim for damages on behalf of appellant's children. Thus, it does not involve a claim for damages on behalf of children who were allegedly abused by reason of an extrajudicial, negligent placement by the State, as in *Babcock v. State*.[40] Rather, after the dismissal of all of the theories of recovery advanced by appellant below

---

[40]*Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991).

save for the claim based upon negligent investigation, the case involves only a single claim for damages suffered by a noncustodial parent for negligent investigation. Those damages cannot include impacts on the father resulting from the State's decision to file, filing, or prosecution of the dependency petition. Any such claims are barred. To succeed on his claim, appellant will have to prove negligence and proximate cause. To prove the latter, he will have to prove not only that the deceased caseworker should have pursued information that the stepfather had anger problems, and had received mental therapy, but that such additional investigation would probably have led to an earlier decision on the part of the State to terminate the dependency proceedings against the father. Such proof may or may not require evidence that additional investigation would have disclosed abuse against the children by the stepfather, but certainly will require some evidentiary basis for the State to have been able to conclude that the children's accusations against their father were obviously untrue. Further, the father's voluntary stipulation to nonvisitation, followed by his voluntary departure from the country for several years, will obviously impact any potential damage claim.

I raise these concerns in order to point out that the majority opinion leaves unanswered many more questions than it resolves. This is perhaps understandable when one realizes that the case as originally pleaded and tried was much broader in scope, and rested primarily upon allegations of misconduct that are clearly barred by the doctrine of absolute immunity.

Review denied at 135 Wn.2d 1015 (1998).