FILED
COURT OF APPEALS
DIVISION II

2013 MAY 21 AM 10: 10

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHAEL SEGALINE, a single person, | No. 42945-4-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF LABOR AND INDUSTRIES, | UNPUBLISHED OPINION |
| Respondent. | |

WORSWICK, C.J. — Michael Segaline appeals the summary judgment dismissal of his negligent supervision and malicious prosecution claims against the Department of Labor and Industries (L&I), and of his 42 U.S.C. § 1983 claim against dismissed defendant Alan Croft. Segaline argues (1) genuine issues of material fact remain regarding malicious prosecution and negligent supervision, and (2) his § 1983 claim was timely under a continuing violation theory. We reverse summary dismissal of Segaline's malicious prosecution claim, affirm on all remaining grounds, and remand for further proceedings.

## FACTS

This case is before us for the second time. In Segaline's first appeal, we affirmed summary judgment dismissal of most of Segaline's claims under the civil immunity granted by

No. 42945-4-II

RCW 4.24.510.[1] *Segaline v. Dep't of Labor & Indus.*, 144 Wn. App. 312, 326-327, 182 P.3d 480 (2008). We also affirmed summary judgment dismissal of Segaline's § 1983 claim against L&I employee Alan Croft as time-barred. 144 Wn. App. at 332. The Supreme Court reversed as to the claims dismissed under RCW 4.24.510, holding that the statute does not give immunity to government agencies, but it affirmed our dismissal of the § 1983 claim. *Segaline v. Dep't of Labor & Indus.*, 169 Wn.2d 467, 479, 238 P.3d 1107 (2010). On remand, the trial court granted summary judgment to L&I on Segaline's remaining claims and denied Segaline's motion to revive his § 1983 claim. Segaline appeals to us once again.

A.    *Substantive Facts*

Segaline is a licensed electrician who routinely seeks permits for electrical work from L&I. Several incidents at L&I's East Wenatchee office in 2003 prompted L&I to serve Segaline with a trespass notice, culminating in his arrest.

The first incident occurred on June 9, when Segaline called L&I's East Wenatchee office about what he characterized as a "bogus" contractor deposit account at the agency. Segaline spoke to L&I service coordinator Jeanne Guthrie. According to Guthrie, Segaline said he would hold L&I employees accountable, that the issue could cost them their jobs, that he would institute legal proceedings, and that he would be bringing a tape recorder to the L&I office. He

---

[1] RCW 4.24.510 provides, in pertinent part:

> A person who communicates a complaint or information to any branch or agency of federal, state, or local government, or to any self-regulatory organization that regulates persons involved in the securities or futures business and that has been delegated authority by a federal, state, or local government agency and is subject to oversight by the delegating agency, is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization.

2

also alluded to something happening if he "w[ou]nd up dead," but he did not finish the sentence. Clerk's Papers (CP) at 87-88. Although Segaline did not yell during this conversation, he talked very loudly.

On June 10, electrical program supervisor David Whittle called Segaline to attempt to resolve the problems Segaline was having. Segaline agreed to meet with Whittle on June 19. That same day, Segaline came to the L&I office and told Guthrie that Whittle had better bring all the necessary paperwork to the upcoming meeting or else he should bring his resume and get ready to join the private sector. Although Segaline seemed calmer than on June 9, Guthrie felt that Segaline was trying to intimidate her and was trying to imply some kind of threat. The only specific threat that Guthrie could name, however, was that Segaline stated he would record his dealings with L&I, which Guthrie feared could lead to a confrontation if anyone objected to being recorded. Guthrie also felt intimidated by Segaline just "being [t]here." CP at 100. However, Segaline did not raise his voice, his face did not get red, and he left of his own accord after about five minutes.

L&I customer service specialist Alice Lou Hawkins was also present at the June 10 encounter. She described Segaline as "quite threatening in his verbal language, very aggressive and threatening and intimidating, red-faced, stating that one of us is going to go to jail, that I'd better get an attorney." CP at 129. She also stated that Segaline was "leaning toward me across the counter very up in my face, very red-faced, yelling, very intimidating, very harassing." CP at 139.

On June 13, there was a longer incident lasting about half an hour. Segaline came to the L&I office and tried to pay for a permit, but it had already been paid for out of his contractor

3

deposit account. Segaline insisted that L&I staff were required by law to accept his money, although L&I staff assured him the money was not owed. According to Guthrie, although Segaline did not scream, he was talking very loudly and the confrontation was very disruptive. Guthrie characterized Segaline's tone of voice as "yelling," but she acknowledged that he did not use profanity or call her any names. Segaline made no threatening hand gestures, but he gesticulated at a clock to emphasize that L&I was wasting his time.

The planned meeting with Whittle occurred at L&I on June 19. L&I Regional Health and Safety Coordinator Alan Croft was also present. At the meeting, Segaline largely refused to discuss how to resolve his conflicts with L&I. Instead, he repeatedly demanded to know under what authority Croft and Whittle believed they could prevent him from recording the meeting, although it was being recorded at the time. Segaline also repeatedly demanded to know what branch of the government Whittle and Croft worked for, repeatedly stated they were not doing their jobs, repeatedly accused them of breaking unspecified laws, and repeatedly insisted that they contact the Attorney General. Segaline also repeatedly insisted on speaking with Guthrie. Segaline eventually left the meeting to try to speak with Guthrie.

According to Croft, Segaline did not yell at the June 19 meeting, but he was red-faced and tense, seeming as if he was "ready to explode." CP at 57. According to Guthrie, Segaline yelled that he wanted to speak with her after he left the meeting. Croft testified at his deposition that he asked Segaline to leave the office at least twice. Croft called 911 when Segaline did not leave; Segaline left just as the police arrived.

After the June 19 meeting, Croft drafted a trespass notice, informing Segaline that he was trespassed from the East Wenatchee L&I offices. Croft listed "disruptive behavior, harassment

of staff and failure to follow instructions for contacting the department" as the basis for the notice. CP at 19. The notice stated that it could be terminated on Whittle's written approval. Shortly thereafter, Croft became aware that trespassing a member of the public from a government office might prove controversial and might not be legal. Croft requested an opinion from the Attorney General's Office on the issue, but he never received any guidance.

The next incident occurred on June 30. Segaline came to the L&I office, and Hawkins attempted to serve the trespass notice on Segaline. Segaline pushed the notice back toward Hawkins and told her that L&I had better get an attorney. According to Hawkins, Segaline yelled during this incident. Police served Segaline with a copy of the notice later that day.

On August 20, Segaline called L&I regarding an emergency permit he needed. The next day, Segaline came into the office. Guthrie objected to Segaline's presence, but Segaline told her that an electrical inspector at L&I had given him permission to enter the building. Segaline was at the office a short time and then left. Guthrie later sent out an e-mail reminding staff that Segaline was under a trespass notice and should not be allowed on the premises.

On August 22, Segaline again returned to the L&I office. An L&I employee called 911, and the police arrived while Segaline was still in the building. The police had been informed that Segaline was causing a disturbance and refusing to leave. Police officers arrived to find Segaline speaking on the phone with his attorney. The police escorted Segaline outside; Segaline insisted that he had the right to enter the building any time he pleased. Segaline told the police that he would keep returning to the office unless he received a call from the Attorney General. The police arrested Segaline for trespass. Segaline was detained at the local jail before he posted

bail. According to Segaline's declaration, he was charged with a crime and the City of East Wenatchee voluntarily dismissed the charges.[2]

B.     *Procedural Facts*

Segaline sued L&I on August 8, 2005, alleging (1) negligent infliction of emotional distress, (2) intentional infliction of emotional distress, (3) malicious prosecution, (4) violation of his civil rights, and (5) negligent supervision. Segaline moved to amend his complaint to add Croft as a defendant to a 42 U.S.C. § 1983 civil rights claim on August 3, 2006. Although the trial court granted the motion to amend, it ruled that the amended complaint would not relate back to the original complaint, finding no excusable neglect in failing to earlier join Croft as a party.

Croft subsequently moved for summary judgment. The trial court granted summary judgment on the grounds that any § 1983 claim against Croft was time-barred under the three-year statute of limitations. The court ruled in the alternative that Croft was entitled to qualified immunity.

L&I moved for summary judgment on Segaline's remaining claims. The trial court granted summary judgment on all claims on the grounds that L&I was immune from suit under RCW 4.24.510. The trial court also ruled that Segaline failed to prove his negligent infliction of emotional distress claim because his damages were not foreseeable. *Segaline*, 144 Wn. App. at 327.

---

[2] The record contains few details about the criminal proceedings against Segaline; the parties do not dispute that Segaline was charged with a crime or that the charges were dismissed before trial.

Segaline appealed, and we affirmed on all grounds. *Segaline*, 144 Wn. App. at 332. The Supreme Court granted Segaline's petition for review and reversed summary judgment on Segaline's intentional infliction of emotional distress, negligent supervision, and malicious prosecution claims because RCW 4.24.510 does not provide government agencies with any immunity from suit. *Segaline*, 169 Wn.2d at 472, 479. But the Supreme Court affirmed dismissal of Segaline's § 1983 claim against Croft because Segaline's cause of action accrued on June 30, 2003, when he was first served with the trespass notice. *Segaline*, 169 Wn.2d at 476. Because Segaline's motion to amend fell outside the three year statute of limitations, the amendment was untimely. *Segaline*, 169 Wn.2d at 476. And Segaline had shown no excusable neglect allowing his amended complaint to relate back to the original complaint, making his § 1983 claim time-barred. *Segaline*, 169 Wn.2d at 476-78.

On remand, L&I renewed its motion for summary judgment on Segaline's remaining claims: intentional infliction of emotional distress, negligent supervision, and malicious prosecution. Segaline replied in opposition to summary judgment, but he conceded that he had not shown a claim for intentional infliction of emotional distress. Segaline also attempted to revive his § 1983 claim by filing a motion entitled, "Motion For Ruling of Timeliness of 42 USC 1983 Action Against Alan Croft on Theory of Continuing Violation." CP at 303.

The trial court granted summary judgment on Segaline's remaining claims. The trial court further denied Segaline's motion to revive his § 1983 claim. The trial court explained in a letter ruling that the untimeliness of the § 1983 claim was the law of the case, and it was "too late" for Segaline to raise a continuing violation theory. CP at 426. Segaline appeals the trial court's dismissal of his malicious prosecution, negligent supervision and § 1983 claims.

## ANALYSIS

### I. STANDARD OF REVIEW

We review an order granting summary judgment de novo. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009). Summary judgment is appropriate where, viewing all facts and resulting inferences most favorably to the nonmoving party, the court finds no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Briggs*, 166 Wn.2d at 801; CR 56(c). "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

### II. MALICIOUS PROSECUTION

Segaline argues that genuine issues of fact remain regarding his malicious prosecution cause of action. We agree and reverse summary judgment in part on this claim.

The elements of malicious prosecution are

(1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution.

*Clark v. Baines*, 150 Wn.2d 905, 911, 84 P.3d 245 (2004). The parties do not dispute the first, fourth, or fifth elements: that L&I instituted the prosecution, that the prosecution terminated on the merits in Segaline's favor or was abandoned, and that Segaline suffered injury or damage as a result. Our focus, therefore, is whether there is a genuine issue of fact as to the second and third elements: probable cause and malice. We hold there is.

A.     *Probable Cause*

L&I argues that there was probable cause for Segaline's arrest because he had violated the trespass notice and because his behavior was disruptive on the day of his arrest. We disagree.

Segaline has established a prima facie case of lack of probable cause by showing that the prosecution terminated in his favor. *Rodriguez v. City of Moses Lake*, 158 Wn. App. 724, 730, 243 P.3d 552 (2010). Additionally we note that the trespass notice was issued based on disputed facts regarding Segaline's behavior and that L&I had reason to question the trespass notice's legal grounds. Thus, genuine issues of material fact remain as to whether L&I had probable cause to institute proceedings against Segaline based on the trespass notice. Moreover, there is a genuine issue whether Segaline was causing any kind of disturbance when the police arrived on the scene and arrested him, making it a genuine issue whether L&I had probable cause to institute proceedings against Segaline based on his conduct on the day of his arrest. As such, summary judgment on this claim was inappropriate.[3]

As we explained in *Loeffelholz v. Citizens for Leaders with Ethics and Accountability Now (C.L.E.A.N.)*, "[t]he test for probable cause in Washington varies as between an informant and a probable cause decision-maker." 119 Wn. App. 665, 696-697, 82 P.3d 1199 (2004) (citing *Clark v. Baines*, 114 Wn. App. 19, 40, 55 P.3d 1180 (2002) (Morgan, J., concurring in part and

---

[3] Segaline argues that there was no probable cause because he could have raised various defenses to a trespass charge. But the existence of a defense to criminal charges does not negate probable cause for the purpose of malicious prosecution. *Cf. Rodriguez*, 158 Wn. App. at 730 (existence of exculpatory evidence did not negate probable cause). The proper question on summary judgment is whether genuine issues of material fact existed as to probable cause. Because they did, summary judgment was inappropriate.

dissenting in part), *rev'd on other grounds by* 150 Wn.2d 905, 84 P.3d 245 (2004)). An informant is the party that supplies information on which a prosecution is based; the decision maker is the party that determines whether those facts are an appropriate basis for the prosecution. *Clark*, 114 Wn. App. at 40-41 (Morgan, J., concurring in part and dissenting in part). "For an informant to have probable cause, he or she must have made to the probable-cause decision-maker 'a full and fair disclosure, in good faith, of all the material facts known to him [or her],' or, in alternative terms, he or she must have 'fully and truthfully communicate[d] to the [decision-maker] all the facts and circumstances within his [or her] knowledge[.]'" *Loeffelholz*, 119 Wn. App. at 697 (quoting *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 499-500, 125 P.2d 681 (1942) (alterations in original)).

Here, L&I was the informant. Thus, probable cause turns on whether L&I fully and truthfully disclosed all of the material facts it knew. L&I contends that there was probable cause based on Segaline violating the trespass notice. But it is disputed whether the trespass notice, which accused Segaline of "disruptive behavior" and "harassment of staff," was based on truthful information. Segaline presented a declaration stating that he never yelled at, harassed, threatened, or otherwise intimidated L&I staff. At his deposition, Segaline admitted to accusing L&I staff of not doing their jobs, to saying that they could be fired, and to saying that they needed to contact an attorney. He also admitted to being "assertive," but he testified that he was "all business" and never once raised his voice when dealing with L&I staff. Taking the evidence in the light most favorable to Segaline, there is a genuine issue of fact whether his conduct was disruptive or harassing. Moreover, there is a genuine issue of fact whether the trespass notice

was valid, and therefore a genuine issue whether L&I truthfully disclosed all facts to the decision maker.

Moreover, the evidence shows that L&I had reason to doubt the legal validity of the trespass notice. Soon after drafting the notice, Croft became aware that there might not be any legal basis to trespass a member of the public from a public building. But it does not appear that L&I ever made the police or prosecutor aware of such misgivings. This, too, creates a genuine issue of fact whether L&I fully disclosed the material facts to the decision maker.

L&I also argues that there was probable cause based on Segaline's disruptive behavior on the day of his arrest. But Segaline testified that, on the day he was arrested, he did nothing more than come to the office and begin to fill out a permit. Once staff told him he was required to leave, he contacted a lawyer on the phone. The police, however, received a report that Segaline was "causing a disturbance" in the L&I lobby. CP at 35. But the only disturbance the police observed on their arrival was that staff appeared to be afraid of Segaline and were standing well away from him. Other than that, he was simply talking on the phone. There is a genuine issue of material fact whether L&I truthfully communicated all material information regarding Segaline's conduct on the day of his arrest.

After the police escorted Segaline outside, Segaline insisted he had the right to be in the building and he refused to stay away without being told otherwise by the Attorney General. One of the officers involved in Segaline's arrest declared that he was concerned about Segaline returning to the office with a weapon because "he did not appear to be fully rational." CP at 36. But Segaline did not mention a weapon, and the only irrational behavior demonstrated by the facts was Segaline's insistence on asserting what he believed to be his rights. The officer's

opinion that it was not fully rational of Segaline to assert his rights does not establish that L&I had probable cause to have Segaline arrested or prosecuted.

There are genuine issues of material fact as to whether the trespass notice was valid and whether Segaline caused any disruption on the day of his arrest. As such, there is a genuine issue of material fact whether L&I had probable cause to institute proceedings against Segaline.

B.      *Malice*

Segaline also argues that there are genuine issues of fact whether L&I acted with malice in having him prosecuted. We agree.

"Malice may be inferred from lack of probable cause and from proof that the investigation or prosecution was undertaken with improper motives or reckless disregard for the plaintiff's rights." *Youker v. Douglas County*, 162 Wn. App. 448, 464, 258 P.3d 60, *review denied*, 173 Wn.2d 1002 (2011). Reckless disregard may be demonstrated by showing that the defendant entertained serious doubts. *Youker*, 162 Wn. App. at 464. Malice may also be demonstrated by a lack of probable cause combined with "affirmative acts disclosing at least some feeling of 'bitterness, animosity or vindictiveness towards the appellant.'" *Youker*, 162 Wn. App. at 464 (quoting *Moore v. Smith*, 89 Wn.2d 932, 943, 578 P.2d 26 (1978) (internal quotation marks omitted)).

Here, taking the evidence in the light most favorable to Segaline, there are genuine issues of material fact whether L&I recklessly disregarded Segaline's rights. As we noted above, soon after drafting the trespass notice, Croft became aware that there might not be any legal basis to trespass a member of the public from a public building. Croft nevertheless did not attempt to rescind the trespass notice.

12

Moreover, Croft and Whittle's meeting with Segaline, taken in the light most favorable to Segaline, shows that neither of them conducted a thorough investigation into the truth of the accusations against Segaline. They could not explain to Segaline what he had done wrong or what he should do differently in the future. Croft's drafting the trespass notice without a thorough knowledge of Segaline's purportedly improper conduct, and his failure to consider rescinding the order after finding out that it might have no legal basis, both permit the inference that L&I recklessly disregarded Segaline's rights.

In addition, there are genuine issues of material fact whether L&I staff had feelings of bitterness, animosity, or vindictiveness against Segaline. An e-mail by Croft after Segaline's arrest informed staff that Segaline had the right to be on the premises, but Croft stated, "I know this is not the information that you, Lou, or I would want." CP at 226. This permits the inference that Croft, who drafted the trespass notice, bore ill-will toward Segaline and did not want to see him return to the L&I office. And the evidence, in the light most favorable to Segaline, permits the inference that the complaints of disruption and harassment against Segaline were false, based on bitterness, animosity, or ill- will, rather than the facts.

Because there are genuine issues of fact regarding both probable cause and malice, summary judgment was inappropriate on Segaline's malicious prosecution claim. We reverse summary judgment on this cause of action.

### III. NEGLIGENT SUPERVISION

Segaline also argues that genuine issues of material fact remain regarding his negligent supervision claim. L&I correctly responds that a negligent supervision claim is available only when an employee acts outside the scope of employment. Because the parties agree that no L&I

13

employee acted outside the scope of employment, there is no genuine issue of material fact as to negligent supervision.[4]

Washington has adopted the elements of negligent supervision set forth in RESTATEMENT (SECOND) OF TORTS § 317 (1965). *Niece v. Elmview Group Home*, 131 Wn.2d 39, 51-52, 929 P.2d 420 (1997). The Restatement provides,

> A master is under a duty to exercise reasonable care so to control his servant *while acting outside the scope of his employment* as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
> (a) the servant
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> (ii) is using a chattel of the master, and
> (b) the master
> (i) knows or has reason to know that he has the ability to control his servant, and
> (ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965) (emphasis added). The first comment to section 317 makes absolutely clear that this cause of action applies only where an employee acts outside the scope of employment: "The rule stated in this Section is applicable only when the servant is acting outside the scope of his employment." RESTATEMENT (SECOND) OF TORTS § 317 cmt. a. *See also Briggs v. Nova Services*, 135 Wn. App. 955, 966, 147 P.3d 616 (2006), *aff'd*, 166 Wn.2d 794 (2009) (negligent supervision requires showing that employee acted outside scope of employment).

---

[4] L&I also argues that Segaline's damages from negligent supervision were not foreseeable. Because it is undisputed that no employee acted outside the scope of employment, we do not reach this issue.

Segaline relies on *Gilliam v. Department of Social & Health Services*, 89 Wn. App. 569, 950 P.2d 20 (1998), to argue that negligent supervision does not necessarily require that the employee act outside the scope of employment. But *Gilliam* supports the rule that action outside the scope of employment is required: "When an employee causes injury by acts beyond the scope of employment, an employer may be liable for negligently supervising the employee." 89 Wn. App. at 584-85. Nothing in *Gilliam* supports a negligent supervision action for conduct within the scope of employment.

There is no genuine issue of material fact that any L&I employee was acting outside the scope of employment in relation to this case. We affirm summary judgment on Segaline's negligent supervision claim.

## IV. 42 U.S.C. § 1983

Segaline further argues that the trial court erred by denying his motion to revive his § 1983 claim against Croft. Segaline argues that his claim against Croft is not barred by the statute of limitations because Croft's conduct amounted to a continuing violation. We disagree.

Whether to allow Segaline to raise this issue below was within the trial court's discretion; under RAP 2.5(c)(1), we do not review issues raised for the first time on remand when the trial court has not exercised its independent judgment and considered them. Moreover, although we have discretion to revisit this claim on appeal under RAP 2.5(c)(2), the circumstances here do not justify such a revisit. We accordingly affirm the trial court's decision not to revive Segaline's § 1983 claim and do not address the merits of Segaline's continuing violation argument.

A.    *Segaline's Claim is Not Appealable Under RAP 2.5(c)(1)*

The parties dispute whether Segaline's § 1983 claim was barred below under the law of the case doctrine. The law of the case doctrine in this context refers to the rule that appellate court decisions are binding on the trial court on remand. *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). But under RAP 2.5(c)(1),

> "If a trial court decision is otherwise properly before the appellate court, the appellate court may at the instance of a party review and determine the propriety of a decision of the trial court even though a similar decision was not disputed in an earlier review of the same case."

Our Supreme Court held per curiam in *State v. Barberio* that "[t]his rule does not revive automatically every issue or decision which was not raised in an earlier appeal. Only if the trial court, on remand, exercised its independent judgment, reviewed and ruled again on such issue does it become an appealable question." 121 Wn.2d 48, 50, 846 P.2d 519 (1993). The permissive language of RAP 2.5(c)(1) gives the trial court discretion whether to revisit an issue not raised in an earlier appeal. *Barberio*, 121 Wn.2d at 51.

Here, although the law of the case doctrine permitted the trial court to address Segaline's continuing violation theory, the trial court did not err by declining to do so. RAP 2.5(c)(1) gave the trial court discretion to consider continuing violation because the Supreme Court expressly declined to consider the issue. *Segaline*, 169 Wn.2d at 476 n.8. Moreover, as Segaline correctly notes, citing *Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash.*, 162 Wn. App. 495, 501-02, 254 P.3d 939 (2011), an order that adjudicates fewer than all the claims in an action is not a final order and is subject to revision at any time. As such, the trial court's summary judgment order, having been reversed in part, was not a final order. But simply because the superior court was not precluded from addressing continuing violation does not mean that it was required to do so.

Because the superior court exercised its discretion to not consider the issue of continuing violation, it is not an appealable issue properly before us under RAP 2.5(c)(1).

B.     *The Circumstances Here Do Not Justify This Court's Consideration of Segaline's Claim Under RAP 2.5(c)(2)*

Segaline also cites RAP 2.5(c)(2), which allows an appellate court to review an earlier appellate decision in the same case. Washington courts have interpreted RAP 2.5(c)(2) as permitting an appellate court to revisit a previous decision when (1) "the prior decision is clearly erroneous, and the erroneous decision would work a manifest injustice to one party;" and (2) "where there has been an intervening change in controlling precedent between trial and appeal." *Roberson*, 156 Wn.2d at 42.

Segaline points to no controlling change in precedent here. Nor can he argue that our decision was clearly erroneous. Moreover, Segaline would suffer no manifest injustice from our declining to revisit our decision that his claim is time-barred. Segaline's failure to timely raise an important legal theory was self-inflicted, not a manifest injustice perpetrated by us.

Segaline relies on *Eserhut v. Heister*, 62 Wn. App. 10, 812 P.2d 902 (1991), to argue that refusing to consider continuing violation would be a manifest injustice, but that case is distinguishable. There, a previous appellate decision announced an erroneous rule that risked perniciously expanding workplace tort liability, such that it would have been a manifest injustice to let the rule stand. 62 Wn. App. at 14. Here, in contrast, Segaline simply failed to raise a legal theory before the trial court, which routinely bars consideration on appeal under RAP 2.5(a). Principles of justice do not demand that Segaline be given a second chance to argue an issue that he failed to timely raise.

No. 42945-4-II

ATTORNEY FEES

L&I requests attorney fees and expenses "pursuant to RAP 18.1." But RAP 18.1 requires more than a bald request for attorney fees; argument and citation to authority are required. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998). We deny L&I's request.

We reverse the summary dismissal of Segaline's malicious prosecution claim, affirm summary dismissal of all other claims, and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, C.J.

We concur:

_____
Van Deren, J.

_____
Penoyar, J.

18